## STATE v. STUCKEY.

1. CRIMINAL LAW—APPEAL—CHARGE—EVIDENCE—DYING DECLARA-TIONS.—When a jury finds a defendant guilty of manslaughter, questions as to failure to charge the law of murder, or with reference to dying declarations, which if believed would make out a case of murder, are eliminated by verdict.
2. CHARGE—AGGRESSOR—HARMLESS ERROR.—Under the facts in this case, failure to instruct the jury as to the importance of who was the aggressor, is harmless error.
3. EVIDENCE—DYING DECLARATIONS.—Facts stated in dying declarations not relevant to the issue, cannot be contradicted by proof of contrary facts.
4. IBID.—IBID.—Dying declarations cannot be contradicted by other declarations of deceased not made *in extremis.*
5. IBID.—IBID.—Is it competent in a homicide case to negative statements of material facts related in dying declarations by testimony tending to disprove such facts?

Before GARY, J., Spartanburg, July term, 1899. Affirmed.

Indictment against J. K. Stuckey for murder of John Sevier. From verdict of manslaughter, and sentence thereon, defendant appeals on the following exceptions, alleging error in the trial Judge:

I. In allowing the witnesses, Dr. W. W. Rigby and Jno. Hart, to testify and state that John Sevier, the deceased, in his alleged dying declarations, stated that he had been "cowardly" shot or "murdered"—the same being not the statement of a fact but the opinion of the said Sevier.

II. In allowing the witness, Dr. W. W. Rigby, to testify and state that John Sevier, the deceased, in his alleged dying declaration, stated that he was shot without "provocation" —the same being but the opinion of the said Sevier, and not the statement of a fact.

III. In allowing the witness, John Hart, to testify and state that John Sevier, the deceased, had said in his alleged dying declaration: "I call on God to witness that I have not

owned a pistol in ten years or a gun in two years"—this statement not being the statement of a fact or circumstance connected with the homicide.

IV. In allowing the witness, J. C. Rigby, to testify to a conversation between Sheriff Dean and John Sevier, the deceased, in reference to two pistols—the same not being a statement of Sevier of a fact or circumstance connected with the homicide.

V. In ruling and holding that it was incompetent for the defence to prove any fact by the witness, R. R. Milan, which now tend to show that the deceased and the defendant were friendly—it being, as we respectfully submit, relevant on the question of "motive."

VI. In not allowing the witness, R. R. Milan, to testify to the conversation between the defendant and the deceased on Saturday before the homicide; it being competent to show, as it is respectfully submitted, any fact, circumstance or statement of Sevier which would tend to contradict his alleged dying declaration, or to show the motive which prompted the defendant to shoot the deceased.

VII. In not allowing the witnesses, E. Bacon and L. P. Epton, to be examined to show: (1) Whether the "cash book" of the defendant would balance or not since the deceased had had charge of it. (2) Whether there were omissions and discrepancies in said book or not since the defendant had had charge of it. (3) What the result of this examination of this book showed. (4) Whether the cash book showed that Sevier was in debt to Stuckey or Stuckey to Sevier. (5) What amount of cash ought to have been on hand. (6) Whether those books showed any errors or discrepancies against Sevier. It being respectfully submitted that it was competent and relevant to prove any fact or statement as coming from the deceased which contradicted or impeached the dying declaration of the deceased.

VIII. In not permitting defendant's counsel to ask the witness, E. Bacon, questions concerning the cash books and entries made therein by the deceased, which would tend to

37—56

show clearly the object and purpose of counsel; it being respectfully submitted that his Honor could only rule upon the question after it was asked, and was in error in undertaking to pass upon the competency or relevancy before the question was asked.

IX. In not permitting the cash books of the defendant, as kept by the deceased, to be introduced in evidence; it being respectfully submitted that it was competent to prove any fact or statement as coming from the deceased which would tend to discredit or contradict his alleged dying declaration.

X. In not allowing the witness, L. P. Epton, or the defendant, to testify: (1) As to the items of property owned by the defendant. (2) Or to show the value of these items. It being respectfully submitted, that it was competent and material to the issues involved, for the defendant to prove any fact which would tend to impeach, discredit or contradict the alleged dying declaration of the deceased.

XI. In not permitting the defendant to introduce testimony of the statement of the deceased, made but a short time before the homicide, to the effect that he was in debt to Stuckey, and not Stuckey to him; it being respectfully submitted that it was competent and material to the issue for the defendant to prove any statement of the deceased which tended to contradict or discredit his alleged dying declarations.

XII. In instructing the jury that they should not consider the testimony of A. B. Tomlinson, to the effect that the deceased had previous to the homicide stated that he was in debt to Stuckey, and not Stuckey to him. It being respectfully submitted that this testimony was competent and material, in that it tended to contradict and discredit the alleged dying declarations of the deceased.

XIII. In not allowing the witness, Milton Holt, to be examined and to testify as to a conversation he had with the deceased the last of November, 1898, in reference to the affairs of the deceased and the defendant. It being respectfully submitted that it was competent to prove any statement

of the deceased which tended to contradict or impeach his alleged dying declaration, or which would in the least degree throw light upon the motive of the defendant in shooting the deceased.

XIV. In not allowing the witness, W. A. Law, to be examined as to a note signed by the defendant and the deceased, and to testify and state who got the money, or to be examined as to who made deposits in his bank for the defendant, or to be examined as to who signed or gave checks for the defendant on the bank of which the witness was president; it being respectfully submitted that it was competent to prove any fact or circumstance which would tend to contradict or discredit any part of the alleged dying declarations of the deceased.

XV. In not allowing the defendant to introduce in evidence checks signed by the deceased, in order to contradict or discredit the alleged dying declarations of the deceased.

XVI. In not allowing the witness, W. A. Law, to testify and state how much money was on deposit in his bank on the 10th of December, 1898, to the credit of the defendant, in order to contradict or discredit the alleged dying declarations of the deceased.

XVII. In not allowing the defendant to state what his assets and liabilities on the 26th of December, 1898, were, or to state the items thereof, or to state how much he was worth over and above his liabilities, in order to contradict the alleged dying declarations of the deceased.

XVIII. In ruling and holding that the offer to introduce in evidence the matters and things referred to in exceptions VII. to XVII. inclusive, was to attempt to justify or excuse the defendant for shooting the deceased, by attempting to prove that the deceased was in debt to the defendant; whereas, it is respectfully submitted, the offer to introduce this evidence was not for the purpose of attempting to justify or excuse the defendant for shooting the deceased, but was for the sole purpose, as stated by counsel at the time, of

proving facts and circumstances which would contradict and discredit the dying declarations on several material points.

XIX. In ruling and holding that the effort to introduce in evidence the matters and things referred to in exceptions VII. to XVII. inclusive, even if offered for the purpose of contradicting or discrediting the alleged dying declarations of the deceased, could not be allowed, because they would only tend to contradict such declarations on immaterial points; whereas, it is respectfully submitted, they would have contradicted such declarations on material and important points, and would have shown: (1) The deceased was largely in debt to Stuckey instead of Stuckey being in debt to deceased. (2) That the defendant was not broke, and would have corroborated the testimony of the defendant, as to the cause of the shooting.

XX. Because in refusing the following requests to charge submitted by the defendant, his Honor did not "declare the law" applicable to the issues in this case as required by sec. 26, of art. 5, of the Constitution, to wit: (1) If there is no proof of express malice, and if the facts and circumstances of a killing are made to appear, and if these circumstances do not show beyond a reasonable doubt that the killing was done with a malicious intent, then the jury are bound to give the defendant the benefit of this doubt, and render a verdict of not guilty of murder. (2) Where it is shown that a homicide occurred, and there is a reasonable doubt as to whether this homicide occurred in a difficulty between the defendant and the deceased, the jury are bound to solve this doubt in favor of the defendant. (3) When it appears that a homicide has occurred in a difficulty, then the question as to who was the aggressor becomes a material inquiry. (4) Where it is a material inquiry as to whether or not the killing occurred in a difficulty, before a verdict of guilty of murder can be rendered, the jury should be satisfied, beyond a reasonable doubt, that the defendant was the aggressor. (5) Before a defendant can be convicted of murder, the State must prove, beyond a reasonable doubt, that the killing

was done with a malicious intent, and if it appears that the killing occurred in a difficulty, then the question as to who was the aggressor becomes a material question in solving the question of malicious intent, and in considering these questions the jury must solve all reasonable doubts in favor of the defendant. (6) In considering the question as to who was the aggressor, or whether a killing was done with a malicious intent, the jury should take into their consideration the previous character of a defendant, and if he has shown that he is a man of good character, this should be considered in enabling them to determine who would likely be the aggressor. (7) While it is true that a defendant, who sets up a plea of "self-defense," must establish this defense by the preponderance of the evidence, it is equally true that, after all the evidence is before the jury, if there is any reasonable doubt as to whether or not such killing was done with malicious intent, such doubt must be solved in favor of the defendant, and a verdict rendered in accordance with such doubt. (8) If the jury have any reasonable doubt as to whether the plea of self-defense has been established by the preponderance of the evidence, such doubt must be solved in favor of the defendant, and the conclusion reached that this plea has been established. (9) A man may be excused for killing another in self-defense, even though he was in no actual danger of losing his life, or of having great bodily harm done him. (10) The jury cannot find the defendant guilty of murder, unless they are satisfied beyond a reasonable doubt that the killing was in pursuance of a malicious intention to kill, formed long enough before the killing to be deliberate; and if there is any reasonable doubt as to whether there was such a deliberate design to kill, the jury are bound to solve this doubt in favor of the defendant and acquit him of the charge of murder. (11) If the jury have any reasonable doubt whether the killing was done from a previously formed design, or under sudden heat and passion, or in self-defense, they are bound to give the prisoner the benefit of all such doubts, and bring in a verdict in accordance with

such doubts. (12) When one is charged with murder, evidence of the good character of the defendant should be carefully weighed and considered by the jury along with the other facts in the case, and of the evidence of such good character along with the other facts, and if it, either with or without such facts, create a reasonable doubt as to the guilt of the defendant, such doubt should be solved in favor of the defendant, and a verdict of "not guilty" rendered. (13) Good character of a defendant, when it has been established to the satisfaction of a jury, should be considered by them just as they would consider evidence of any other fact which may have been proven, because the law requires that all reasonable doubts are to be solved in favor of a defendant. He is, therefore, entitled to prove his good character, because what might be a clear state of facts against a man of bad character, might, when applied to a man of good character, appear inconsistent with his guilt, and so enshroud the transaction with such doubt as to justify an acquittal. Good character of a defendant is a fact when proven to the satisfaction of a jury, which is to be weighed and considered by them as they do all other facts. Its value is not limited to doubtful cases; but, on the contrary, it may of itself create a reasonable doubt as to evidence which might otherwise appear conclusive; and if it, either with or without other facts, create such doubt, then the verdict must be in favor of the defendant. *State* v. *Bodie,* 25 S. C., 176, 53 Am. St. Rep., 888. (14) In considering any testimony that may have been given of the dying declarations of deceased, the jury, in order to determine what weight should be given it, should consider and determine: (1) Whether or not alleged dying declaration was made in the presence of approaching death; and (2d). Whether or not the deceased at the time he made the alleged declaration had given up all hope of life. If the jury has any reasonable doubt on either of these two questions, they are bound to solve such doubt in favor of the defendant, and refuse to consider any of the testimony relating to the alleged dying declarations. (15) The mere fact that

a man who is dying makes a declaration, is not of itself sufficient to warrant a jury in receiving it as true, even though it appears that such declaration was made in the face of approaching death and after all hope of life had been given up. (16) The law does not attach any more importance, or give any greater credence to testimony of the dying declarations of a man, than it would to the testimony of the same man, if it were given under oath in the trial of a similar cause. (17) A jury has the same right to doubt dying declarations that they have to doubt the testimony of a living witness. (18) In considering and weighing testimony of dying declarations, in order to determine what weight should be given them, the jury has the right, and should take into consideration all the facts and circumstances connected with the deceased, both before and at the time he is said to have made the declarations. (19) In considering and weighing testimony of dying declarations, the jury has the right, and should take into consideration the mental and physical condition of the deceased at the time he is said to have made these declarations; and whether or not, while making them, he manifested any hatred or malice towards the defendant; and whether or not any material statement of such dying declaration has been successfully contradicted or not. (20) Testimony of dying declarations is admitted in homicide cases, because of necessity; and a jury, in considering it and determining what weight should be given it, should also remember and take into consideration the fact that the opportunity of cross-examination is very often quite essential to bringing out the truth, and that the accused, in cases where testimony of dying declarations is admitted, has been deprived of this opportunity of cross-examination. (21) A jury, in order to determine what weight should be given testimony of alleged dying declarations, should not only take into consideration the mental and physical condition of the deceased at the time he is said to have made them, and whether or not he exhibited malice or hatred towards the defendant; whether or not they were made under circum-

stances which would naturally produce great excitement;
and whether or not any material statement of such dying
declarations have been successfully contradicted; but they
should also take into consideration the length of time that
has elapsed since they were made, and whether or not the
witnesses who undertake to relate them are depending en-
tirely upon their memory for the accurancy of their respec-
tive statements.    (22) A man's character for truth may be
impeached by contradicting him as to material facts of his
testimony, and if any of the material facts of a dying decla-
ration are successfully contradicted, then the jury have the
same right to doubt the truth of the other facts of such dying
declarations, which have not been contradicted, that they
have to doubt the testimony of a living witness, where a
part of his testimony has been contradicted, and, after such
contradiction has been made, if any has been made, any rea-
sonable doubt which they may have should be solved in favor
of the defendant.    (23) A jury should weigh with great
deliberation and should consider well all the facts surround-
ing any alleged dying declaration, such as the physical and
mental condition of the deceased at the time such declara-
tions are said to have been made; whether or not they were
made at a time and under circumstances which would natur-
ally produce excitement; whether or not any hatred or
malice was exhibited in making them; whether or not any
material part of them have been successfully contradicted;
the length of time since such declarations are said to have
been made, and whether or not the witnesses who undertake
to relate them depend entirely upon their memory for the
accurancy of their statements.    (24) If, after considering
all the facts and circumstances surrounding any alleged dy-
ing declarations, the jury have any reasonable doubt as to
the truth and correctness of such declarations, or any part
thereof, such doubt should be solved against the truth or cor-
rectness of such alleged dying declarations, or parts thereof,
and in favor of defendant.

XXI. Because his Honor, in refusing the requests to

charge submitted by the defendant, as set out in the various subdivisions of exception XX., did not submit to the jury for their consideration, as it is respectfully submitted he should have done, the following: (1) Who was the aggressor in the difficulty which occurred between the defendant and the deceased? (2) That a man may be excused for killing another, even though there was no actual danger. (3) That they were entitled to consider and weigh any evidence of the good character of the defendant. (4) That dying declarations could be contradicted or impeached. (5) What evidence should be considered or weighed by the jury in connection with evidence of dying declarations? (6) What reasonable doubts should be solved in favor of the defendant?

XXII. In not charging that if upon all the testimony the jury should entertain a reasonble doubt as to the guilt of the defendant, they should return a verdict of "not guilty."

*Messre. Duncan & Sanders* and *Hydrick & Wilson,* for appellant, cite: *As dying declarations only, facts connected with the homicide are relevant:* 43 S. C., 55; 12 Rich., 330. *Dying declarations can be contradicted by others of deceased:* 164 U. S., 697. *Error to refuse request as to weight to be given dying declarations:* 13 S. C., 458; 164 U. S., 697. *Error to refuse requests as to character:* 33 Am. R., 140; 38 Ib., 695; 25 S. C., 178; 54 Am. R., 487; 53 Am. St. R., 888. *Error to refuse request as to aggressor:* 39 S. C., 157. *Error to refuse requests as to self-defense:* 13 S. C., 466; 43 Am. St. R., 20; *and that as to doubt:* 33 S. C., 132.

*Mr. Solicitor Sease* and *O. L. Schumpert,* contra.

*Assistant Attorney General U. X. Gunter, Jr.,* also contra, cites: *As to what statements in dying declarations are competent:* 105 Ind., 469; 61 Miss., 161; 4 Pac. R., 769; 20 Ia., 257; 75 N. Y., 159; 81 Ala., 20; 15 Rich., 342.

38—56

March 19, 1900. The opinion of the Court was delivered by

Mr. JUSTICE POPE. The defendant was indicted for the murder of John Sevier. The jury rendered a verdict of guilty of manslaughter. The defendant has appealed therefrom. His exceptions are more than fifty in number. All those exceptions relating to murder being exceptions one, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen, and subdivisions (1), (4), (5), (6), (7), (10), (11), (12) of exception twenty, are overruled, because the verdict of the jury has determined that murder is no longer in this case, and it would be a waste of time to cumber the record with a decision of questions that have ceased to be practical. These exceptions are, therefore, overruled.

The next set of exceptions seem to relate to the matter of dying declarations, but in this matter also it seems that the verdict of the jury, "guilty of manslaughter," has rendered it unnecessary that we should devote much, if any, consideration to these particular exceptions. Certain it is that if the dying declaration of John Sevier had been accepted by the jury, they would have established that his taking off by the defendant was a cruel murder. The jury by their verdict say the deceased dying declarations were erroneous; that Stuckey had no malice in his heart towards Sevier on that occasion; that when Stuckey killed Sevier, it was without malice, upon sudden heat and passion, and upon sufficient provocation. Why, therefore, any questions can be said to arise in regard to John Sevier's dying declarations, that he was murdered by Stuckey—that he not only had no weapon on that day, but had not owned or possessed a pistol in years—we cannot well see. These exceptions are overruled.

Some of the exceptions seem to complain that the Circuit Judge did not, in his charge, lay some pressure upon the question as to who was the first aggressor. Only two witnesses were present and could speak of what occurred

at the homicide, namely: John Sevier and J. K. Stuckey. Of these, J. K. Stuckey alone testified as to the origin of the difficulty, and its history. He said, without notice to him, John Sevier, pointing a pistol at him, said to him, "I am damn tired of these insinuations," and that thereupon he, Stuckey, shot. In Sevier's dying declaration he claimed that without notice or cause J. K. Stuckey shot him to death. There was no question, therefore, as to who was the aggressor, for if Stuckey was believed, John Sevier assaulted him without notice or cause with a pistol, and, on the other hand, if Sevier was to be believed through his dying declarations, Stuckey laid him low by two pistol shot wounds, without cause or notice. The jury accepted J. K. Stuckey's statement. Therefore, if there was any error, it was harmless.

The appellant complains by his exceptions that the Circuit Judge declined to allow W. A. Law and others to testify as to the facts which tended to disprove some of the matters embraced in the dying declarations of John Sevier, which had already been admitted, by showing other facts than those embraced in dying declarations. These matters in the dying declarations were not substantive —they were really irrelevant. The Circuit Judge did not err in reference thereto.

Some of these exceptions relating to the dying declarations of John Sevier complain that the Circuit Judge ought to have allowed the witnesses of the defendant to testify to certain alleged declarations of John Sevier made in his lifetime, and not *in extremis,* which it was claimed would negative certain dying declarations made by him. This Court quite recently has decided that such testimony ruled out by the Circuit Judge was incompotent, *The State* v. *Taylor,* 56 S. C., at p. 369. There, among other things, the Court said: "To hold that it is competent to impeach the dying declaration of a deceased person by testimony tending to show that she had made statements in conflict with those contained in her dying dec-

larations, not under the sanction of an oath, or under the
shadow of impending death, would tend not only to afford
a strong temptation to the fabrication of false testimony to
·save the life of the accused, when death had rendered it im-
possible to rebut or explain such statements, but would also
tend to absolutely destroy the efficiency of dying declara-
tions as evidence.    We do not think, therefore, that such
testimony is competent."

Those exceptions which seek to impute error to the Cir-
cuit Judge in not suffering the defendant to introduce testi-
mony to negative the statement of facts contained in the
dying declarations other than those which sought to nega-
tive the 'dying declarations by contradictory state-
ments made by the deceased when not *in extremis,*
we must confess, we have regarded as not only im-
portant, but very interesting.    In our State, as will be seen
by a goodly number of adjudicated cases, beginning with
*The State* v. *Terrell,* 12 Rich., 321, followed by *The State* v.
*Quick,* 15 Rich., 342; *The State* v. *Belton,* 24 S. C., 185;
*The State* v. *Johnson,* 36 S. C., 153; *State* v. *Banister,* 35 S.
C., 290; *State* v. *Petsch,* 42 S. C., 132; greater latitude is
allowed in proving circumstances by the dying declarations
than is allowed in many jurisdictions; for, as is set out in 10
A. & E. Ency., at page 383 (2d edition), elsewhere, "Dying
declarations are usually inadmissible to prove what occurred
either before the commission of the act which caused the dec-
larent's death, or after that transaction," and cases cited.    It
would seem, therefore, if greater latitude obtained in our
Court to give in evidence circumstances which happened be-
fore and after the fatal act by means of dying declarations,
we should allow the admission of testimony which tends to
disprove those circumstances.    But inasmuch as the verdict
rendered by the jury eliminates murder, the circumstances
which were complained of in the dying declarations were
rendered harmless, and, therefore, it becomes useless to con-
sider whether such testimony was competent or not.    So we
do not pass upon this matter.    The report of the case should

set out the exceptions.    Each one has been considered and is overruled.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed, and the action is referred to Circuit Court to enforce the judgment of such Circuit Court.