6768

## STATE v. MILLS.

1. CONTINUANCE.—Refusal of continuance because of absence of several witnesses for defense and inability of his wife to be present, it then appearing that she was in a foreign State, and no reason for her inability to be present being there stated, but afterwards the reason was given to be her pregnancy, *held* not an abuse of discretion under facts here. The wife came into court before defense was closed and remained during the rest of the trial.

2. JURY.—That jury commissioners laid aside names drawn by them from the jury box as in their opinion not suitable to act as jurors— some were illiterate, some not known to them, some rowdy, drinking —will not render venire illegal.

3. EVIDENCE—DYING DECLARATIONS.—Declarations of deceased that he only had a knife on his person as a part of a connected statement, properly admitted here because no motion was made after its reception to strike out as not a part of a dying declaration, and because it was not disputed that deceased had only a knife on his person.

4. IBID.—WITNESS—CONTRADICTION.—That deceased told the witness that he had been intimate with the wife of deceased is not admissible to contradict his dying declarations or the statement of a witness for the State.

5. IBID.—IBID.—IBID.—A defendant when sworn in his own behalf may be asked about any of his past transactions tending to affect his credibility, but not about such as affect his character in other respects. Here evidence of the latter kind permitted to remain, because when objection was made there was nothing to show the rule would be violated, and afterward no objection was made to the incompetent part.

6. CHARGE.—A hypothetical statement of the facts in issue in a case, if so stated as to admit of only one inference, is not a charge on the facts.

7. IBID.—It is not error to instruct jury that they dare not go beyond the jury box in considering testimony offered.

Before PURDY, J., Cherokee, June, 1907.    Affirmed.

Indictment against W. H. Mills for murder of Frank Deal. From sentence on verdict of guilty with recommendation to mercy, defendant appeals.

*Messrs. Stanyarne Wilson* and *J. C. Otts,* for appellant. *Mr. Wilson* cites: *Jury illegally drawn:* 23 Stat., 1066; 77 S. C., 250. *Declaration of deceased that he only had a knife is not a dying declaration:* 4 Ency. Ev., 1005; 56 S. C., 586; 58 S. C., 351. *Dying declarations may be shown to be fallacious:* 10 Ency., 382; 4 Ency. Ev., 1013; 56 S. C., 588. *Rule of cross-examination as to past transactions:* 77 S. C., 242; 34 S. C., 39; 26 S. C., 120. *Statement, "If*

you find these to be the facts in the case," is charge on the *facts:* 76 S. C., 63; 47 S. C., 461; 57 S. C., 340; 51 S. C., 460; 61 S. C., 563; 63 S. C., 515; 65 S. C., 331; 68 S. C., 161; 71 S. C., 159.

*Mr. Otts* cites: *Jury improperly drawn:* 23 Stat., 1066; 24 Ency., 219; 3 Blackf., 37; 5 Park. Cr., 308; 130 N. C., 229; 25 Ter. Cas., No. 1, 4829; 12 Ency., 334; 63 S. C., 548; 22 Stat., 687; 1 Browne, 121. *Statements of deceased in contradiction of dying declarations competent:* 56 S. C., 578, 360; 18 Ga., 194; 56 S. C., 434; 43 S. C., 62; 58 S. C., 356; 35 S. C., 32; 17 L. R. A., 654. *Rule of cross-examination as to past transactions:* 76 N. Y., 288; 1 Green. Ev., 444b, 449, 499d; 2 Phil. on Ev., 943; 7 N. Y., 378; 3 App. Div., 127; 3 L. A. R., 535; 161 U. S., 85; 34 S. C., 38; 33 S. C., 502; 26 S. C., 117; 2 Mill., 174; 76 S. C., 116; 78 Ala., 474; 76 N. Y., 288; 27 N. Y., 571; Underhill on Cr. Ev., Secs. 60-61; 3 Whart. Cr. Ev., Secs. 323, 430, 432, 433, 465, 475; Rice on Ev., 269-314; 2 Taylor on Ev., 1465; Roscoe on Cr. Ev., Secs. 232-234; 11 Wend., 19; 161 U. S., 85; 29 Vt., 25; 101 Wis., 627; 146 Mass., 512; 6 Id., 383; 106 Col., 83; 26 Mich., 157; 67 Miss., 333; 11 Gray, 450; 66 Me., 116; 68 Col., 101.

*Solicitor T. S. Sease* and *Butler & Osborne,* contra. *Butler & Osborne* cite: *No abuse of discretion in refusing continuance:* 58 S. C., 335; 56 S. C., 378. *No illegality in drawing jury:* 77 S. C., 250; 75 S. C., 296; 73 S. C., 518; 68 S. C., 500. *The whole of dying declaration should be admitted and then incompetent parts stricken out on motion:* 43 S. C., 148; 58 S. C., 335. *Dying declaration should not be contradicted by previous contrary statement:* 56 S. C., 368, 576. *Right of cross-examination of defendant:* 56 S. C., 533; 26 S. C., 119. *Charge excepted to not on facts:* 59 S. C., 246, 303; 58 S. C., 380; 47 S. C., 488; 55 S. C., 100.

February 25, 1908. The opinion of the Court was delivered by

MR. JUSTICE GARY. The defendant was indicted for the murder of Frank Deal, and the case was tried before his Honor, Judge Purdy, and a jury, on the 26th of June, 1907. The jury rendered a verdict of guilty, with recommendation to mercy, and he was sentenced to imprisonment for life.

The first assignment of error is, that his Honor, the presiding judge, refused the defendant's motion for a continuance.

The following statement appears in the record: "Upon the call of the case for trial, defendant's attorneys moved for a continuance upon the ground of the absence of three witnesses, including Mrs. Lola Mills, defendant's wife. In this motion, defendant's attorneys did not claim that Mrs. Mills was not able to testify by reason of being pregnant, but the ground for continuance, so far as it related to her, was solely on the ground, as stated by them, that they could not have her at court. In support of their motion, they submitted affidavits and letters. Attorneys for the State submitted counter-affidavits, letters and communications, as well as oral testimony. After consideration of same, the Court ordered that the case proceed to trial. After this ruling was made, one of the attorneys for the defendant made reference to the alleged condition of Mrs. Mills, but was told by the judge that this statement was insufficient, but that he could file an affidavit to that effect, which was done after court reconvened in the afternoon, and the motion for a continuance was renewed on this ground, and was overruled by the judge. After testimony on both sides was closed, Mrs. Mills, who was in Gaffney, before defendant closed his case, came into the court-room and from that time on, till the verdict was rendered, sat with the defendant during the further proceedings and arguments. Mrs. Mills appeared to be reasonably strong and did not appear to be overcome physically by the ordeal of sitting during the pro-

ceedings of the Court. Mrs. Mills wore a maternity cloak, and while apparently pregnant, there was no means of determining the state of such pregnancy."

At the time the motion was made Mrs. Mills was in North Carolina, and therefore was not within the jurisdiction of the Court. She gave birth to the child on the 6th of October, 1907. The appellant's attorneys have failed to satisfy this Court that there was an abuse of discretion in refusing said motion.

The next assignment of error is, that the presiding judge overruled the motion of the defendant's attorneys, to quash the venire.

Before the jury was impaneled, the defendant's attorneys made a motion to quash the venire, on the ground "that the jurors were selected in a different way from that prescribed by statute; that names were drawn out of the box that were not put on the venire, and that the venire was composed of men that they selected, and that they discarded the names of men as jurors for reasons other than those prescribed by the statute, to wit, absence from the county or unable to attend Court."

Upon the request of the appellant's attorneys, W. D. Camp, the County Auditor, was placed upon the stand, and testified as follows:

"Q. You were the auditor of the county when this panel was drawn? A. Yes, sir. Q. Squire, how many names were drawn out of the box altogether. A. I don't know how many were drawn out altogether. We would take out a name and we would generally consult whether we knew that man and his character and whether he was a fit man to be on the jury. If he was not, we would take his name out and lay it aside. Q. How many names did you reject that way? A. I have no idea about that. Q. That is what we want to know. A. When we refused one, didn't think he was qualified as a legal juror, we would lay it aside until we got our number. Q. What test did you apply in determining whether he was a proper man for a juror or not?

A. We generally wanted to know him, whether there was any legal objection to him. Q. If you didn't know him you objected? A. Sometimes. Q. When you didn't know him at all you would reject them? A. No, not on that ground alone. Q. When you didn't know him what other ground did you have? A. Where we didn't know whether he had a good character. Q. Then you rejected him? A. Yes, sir. Q. How many of that kind did you reject, because you didn't know them? A. I have no idea how many. Q. Did you reject a half a dozen on that ground? A. Not any one in particular. Q. On the ground you didn't know him? A. I don't think we did. Q. You do not know how many you rejected on that ground? A. Do not know. Q. You rejected some on the ground that you did not know them? A. Yes, sir. Q. Did you reject any others on any other ground? A. I don't remember any particular grounds. Q. Why did you reject the others? A. We didn't think he was a competent man to serve on the jury. Q. Competent in what way? A. In our judgment we thought he would not be a good juror; didn't have judgment, illiterate man. Q. Only men who had judgment and were not illiterate could serve on the jury? A. No; we thought we tried to pick the best men we could in the county. Q. In other words, you selected the jury out of those names which you drew out? A. We rejected men we thought perhaps might not be competent to sit on a jury. Q. On what ground? A. On the grounds discussed—we would discuss the matter between ourselves. Q. I want to know on what ground? A. If we knew the man was a drunkard. Q. How many of that kind did you reject? A. I don't know that; we never counted the names that we rejected. Q. You did reject some? A. I do not know how many because of drinking liquor. Q. You didn't think for that reason that they ought to sit on the jury? A. Rowdy man. Q. You don't know how many you rejected on that account? A. No. Q. On what other ground did you prevent them from sitting on the jury? A. I don't know. Q. Can you give me the names

of the men you rejected? A. No, sir. I just laid them down there; laid them aside. Q. I am trying to get at the ground, you thought were incompetent, those you knew you rejected? A. I don't recollect any particular kind of excuse. Q. Some you rejected on the ground that you thought, as you say, were illiterate men, men that could not read and write? A. That we thought had sufficient information. Q. So you rejected some because you didn't know them, and you rejected others because they were illiterate and you thought didn't have sufficient information to serve as a juror? A. I thought pretty near every man in the county was known by one of us. Q. That was the method you all adopted in selecting a jury out of those names that were drawn out of the box? A. We consulted as to whether they were proper men. If he was not competent then we rejected him. Q. In arriving at that conclusion as to whether they were proper men or not, men whom you didn't know, that none of you knew, to be a good juror? A. We might have done that as one reason, perhaps. Q. Those you didn't think could read and write or had sufficient information, why then you put them aside? A. I suppose so."

Section 2, of the Act of 1902, 23 Stat., 1066, provides that the county auditor, county treasurer and the clerk of court shall prepare a list of the qualified electors, under the provisions of the Constitution, between the ages of twenty-one and sixty-five years, and of good moral character, as they may deem otherwise well qualified to serve as jurors, being persons of sound judgment and free from all legal exceptions.

Section 4 provides that the jury commissioners shall draw from the jury box eighteen ballots containing the names of eighteen persons who shall constitute the grand jury; that "if there shall be drawn from said box a ballot containing the name of any person not between the ages of twenty-one and sixty-five years, or not of good moral character, or is otherwise disqualified to serve as a juror, such ballot shall be destroyed and such name struck from the said list, and

another ballot drawn, and so on, until the eighteen are secured." The petit jury is drawn in the same manner.

Section 7 is as follows: "That all jurors shall be selected by drawing ballots from the said jury box, and, subject to the exceptions hereinbefore contained, the persons whose names are on the ballots so drawn shall be returned to serve as jurors."

Section 14 is as follows: "That the jurors drawn and summoned under the provisions of this act must have the qualifications that are now, or may hereafter be prescribed by law."

When the testimony of the auditor is considered in its entirety, we are unable to discover anything except the honest effort of a faithful officer to allow none but those possessing the qualifications prescribed by statute to serve as jurors, for which he is to be commended. The jury commissioners are allowed the same discretion under Section 4 as is conferred upon them by Section 2.

It is not contended that any of the persons drawn to serve as jurors were disqualified, and even if there were irregularalarities, they are not such as to render the venire illegal. *Rhodes* v. *R. R.,* 68 S. C., 494, 47 S. E., 728; *State* v. *Smalls,* 73 S. C., 519, 53 S. E., 976; *Hutto* v. *R. R.,* 75 S. C., 295; *State* v. *Smith,* 77 S. C., 248.

The third exception is as follows: "That his Honor erred in permitting testimony of the witness, Caldwell, for the State over defendant's objection, that deceased stated to him that the only weapon he had was a knife and that it was in his pocket, the error being that such declaration was incompetent and not admissible as part of dying declaration."

The question arose in the following manner:

"Q. State whether or not you felt about his person and asked him whether he had a weapon. A. Yes, sir. Mr. Wilson: We object on the ground that that is not competent as a part of the dying declaration. Court: Anything he said

at that time as a connected statement would be competent. Exception noted. Q. What did you ask him about weapons? A. I asked him if he had any knife and he said yes, he had one in his pocket. Q. Did you feel in his pocket then? A. Yes, sir; I unbuttoned his overalls and it was in his left-hand pocket. I didn't take the knife out. Q. Did you later take it out of his pocket? A. I did not. Q. State whether or not you saw anybody else? A. Yes, sir. The coroner took it out."

It will be observed that the only objection was to the question: "State whether or not you felt about his person, and asked him whether he had any weapon." The appellant's attorney neither made a motion to strike out that portion of the dying declaration which they deemed objectionabel nor did they move the Circuit Judge to instruct the jury to disregard such portions. *State* v. *Petsch,* 43 S. C., 132, 20 S. E., 993.

Furthermore, the fact that the knife was the only weapon on the person of the deceased when he was shot does not seem to have been in dispute.

The next assignment of error is that the presiding judge refused to allow defendant's witnesses to testify that the deceased told them of his intimacy with Mrs. Mills, the object of such testimony being to contradict the dying declarations and the witness, Mrs. Williams, who testified that the deceased and Mrs. Mills were not intimate while at her house.

It is only necessary to refer to the cases of *State* v. *Taylor,* 56 S. C., 360, 34 S. E., 939, and *State* v. *Stuckey,* 56 S. C., 576, 35 S. E., 263, to show that the exceptions raising this question can not be sustained.

The sixth exception is as follows: "That his Honor erred in permitting the State, over defendant's objection, to examine defendant as to difficulties he had been involved in years before, at various places in this State and others, the ruling being, 'this is subject to the same rule that a witness

would be on cross-examination. You can cross-examine a witness as to his past life and conduct, in order to show the jury the character of the witness; the error being that it was not competent to thus attack defendant's reputation for peaceableness when he had not put it in issue, and it was not competent or proper to thus burden the case with offenses not in anyway connected with this indictment."

This question arose as follows: "Q. Did you ever live in Durham, North Carolina? A. Yes, sir. Q. You know Mr. L. A. Dempsey? A. Yes, sir. Q. You got in some trouble in Durham, didn't you? A. What kind of trouble? Mr. Wilson: We object to asking this witness about some trouble he got into in Durham. The Court: This is subject to the same rule that a witness would be on cross-examination. You can examine a witness as to his past life and conduct in order to show the jury the character of the witness. I have no idea what this trouble was. I apprehend the details of it will not be gone into. Mr. Butler: I am not going into details. Q. You got into trouble there, and did you not leave the town very early next morning and you spent the night with Mr. Dempsey? A. No, sir. Not very early. Q. What train? A. Somewhere along about ten o'clock. Q. About the first one that went out? A. No, sir. It went out about ten o'clock. Q. Who was the man you cut? A. I don't know. Q. Did you ever live in Atlanta? A. Yes, sir. Q. You worked for the Fulton Bagging and Cotton Mill Company? A. Yes, sir. I put up machinery there. Q. What shooting occurred there? A. I don't know. Q. Never did? A. No, sir. Q. Somewhere in Atlanta when you were there? A. No, sir. Q. You remember old man Joe Wilkie, father of the girl you married? A. Yes, sir. Q. You shot him, didn't you? A. Yes, sir. Q. You remember George Cade? A. Yes, sir. Q. You ever work at Bath, Aiken County? A. Yes, sir. Q. You cut a fellow down there, didn't you? A. Yes, sir. Q. You got in trouble in Birmingham with a circus man and got

arrested? A. No, sir. Didn't get arrested; just carried me outside of the tent; said I would have to go out if I disturbed anything in there. Q. Did you disturb anything in there? A. I don't know."

The defendant, when sworn in his own behalf, may be asked on cross-examination about any of his past transactions tending to affect his credibility, but not about such as affect his character in other respects. *State* v. *Robertson,* 26 S. C., 120, 1 S. E., 443; *State* v. *Mitchell,* 56 S. C., 533, 35 S. E., 210. When this objection was made there was nothing to show that the transaction inquired about was not one tending to affect the credibility of the witness. The Circuit Judge was not in error therefore at the time in admitting the question. Had the objection been made or renewed when it subsequently appeared the transaction did not tend to affect the credibility of the witness, it would have been error to allow the examination to continue. *State* v. *Wyse,* 33 S. C., 582, 12 S. E., 556; *State* v. *Taylor,* 56 S. C., 360, 34 S. E., 934; *State* v. *Kenny,* 77 S. C., 236; *State* v. *Robertson, supra; State* v. *Mitchell, supra.* But the objection was not made at that time, and must, therefore, be considered waived.

The seventh exception is as follows: "That he erred in charging the jury the State's sixth request, as 'A man is not justified under the law in taking the life of another merely upon suspicion, or even upon being told that his wife has had illicit relations with the deceased, and if he does so and has malice in his heart at the time, and he is at fault in bringing about the difficulty, or there was no real or apparent necessity to kill, or there was a reasonable way to escape from the necessity to kill without taking life, then that would be murder, under the law, and if you find those to be the facts in this case, your duty will be to convict the defendant of murder;' the error being that it was a charge upon the facts in violation of the Constitution of the State, as his Honor thereby instructed the jury to convict defendant if it found certain fact against him, which facts

were the very facts upon which nearly the entire testimony in this case was given and upon which the State asked for conviction, to wit, that defendant killed deceased because of his having been 'told that his wife had had illicit relations with the deceased,' and thereby, in so many words, directed a verdict of murder against the defendant."

This exception can not be sustained, for the reason that only one inference could be drawn from the facts hypothetically stated. It was a mere statement of the elements constituting murder.

The eighth exception is as follows: "That his Honor erred in using this language, calculated to intimidate and coerce the jury, 'You dare not go beyond that jury box in considering the testimony offered;' the error being that as matter of law the jury are supreme in their jury box and there is none of whom they are to be afraid, and such language was an intimation and a threat, with nothing substantial or legal to stand upon, or back it up, but which, nevertheless, had its effect, doubtless, upon the jury, to the prejudice of defendant."

We see no error in calling the attention of the jury to what was their plain duty.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.