9866

STATE v. BROWN *ET AL.*

(95 S. E. 61.)

1. CRIMINAL LAW—TRIAL—SEVERANCE.—In a prosecution for murder against two striking union men and three nonunion men, severance on the ground that the defenses of the latter were antagonistic to the defenses of the former was properly denied.

2. HOMICIDE—EVIDENCE—DYING DECLARATIONS.—In a prosecution for murder, testimony of a witness that deceased had stated to him that two defendants had cut him was admissible as a dying declaration, where it was shown that deceased apprehended death by stating to the witness that he was cut to death and killed.

3. HOMICILE—EVIDENCE—DYING DECLARATIONS.—It is incumbent on the party offering to introduce a dying declaration to show that it fulfills the requirements of the law, and the mere fact that declarations may have been made on a previous occasion under such circumstances as to render them admissible is not sufficient to show that subsequent declarations are admissible.

4. HOMICIDE—EVIDENCE—DYING DECLARATIONS—IMPEACHMENT.—In a prosecution for murder, deceased's dying declaration cannot be impeached by statements made later by deceased to another party, a nurse in a hospital, at another time, and not under shadow of impending death.

5. CRIMINAL LAW—TRIAL—INSTRUCTION ON FACTS.—In a prosecution for murder, the charge that in regard to the jibes proved to have been used, if they were of such a nature as reasonably to cause one to resent them by a blow, and did actually bring about that result, then the party who had engaged in the jibes would be precluded from availing himself of the plea of self-defense was not erroneous as a charge on the facts.

6. HOMICIDE — TRIAL — INSTRUCTIONS — CHARGE ON LAW OF MUTUAL COMBAT.—In a prosecution for murder, charges relating to the law of mutual combat, considered in connection with the entire charge, *held* too favorable to defendants rather than prejudicial.

Before GARY, J., Greenville, Spring term, 1916. Affirmed.

Exceptions 4, 5, 6, 7 and 8, directed to be reported, were as follows:

(4) His Honor erred in charging the jury in substance that if the defendants agreed to have a fight and engaged in a fight they are supposed to have intended the consequences which followed from that unlawful act, from which death resulted and are equally responsible. It is submitted that said charge was erroneous; that persons engaged in such a fight are not responsible for the killing of another, unless it appears to the jury that such death is a probable consequence of such a combat.

(5) It is submitted that his Honor erred in charging the jury upon the facts, in that he stated to the jury as follows: In regard to the jibes that were proved to be used there, if they were of such a nature reasonably to cause one to resent them by a blow, and did actually bring about that result, then the party who has engaged in those jibes would be precluded from availing himself of a plea of self-defense. It is submitted: (a) That this was a charge upon the facts in violation of article V, sec. 26 of the Constitution of South Carolina, in that the Court thereby stated as a fact that jibes were proved to have been used; (b) that it was erroneous, in that it precluded the person using such jibes from pleading self-defense after placing himself in defense of his friend or relative, or upon resisting an attack made upon him with a deadly weapon, which might not have been a result reasonably to have been anticipated from the use of such jibes; and (c) that it was an erroneous statement of the law.

(6) His Honor erred in charging the jury that if one comes to the assistance of his friend or relative, he enters the combat upon the same footing as the person to whose assistance he comes and under the same legal status. It is submitted: (a) That this was a charge upon the facts in violation of article V, sec. 26 of the Constitution, in that it made the original fault or innocence of the friend or relative the sole test of the justification of the person intervening; (b) it was a question for the jury to determine whether or not, under the circumstances existing at the time of the intervention, the party so intervening was justified; (c) that it was an erroneous statement of the law.

(7) His Honor erred in charging that "if one voluntarily enters a mutual combat where deadly weapons are used, knowing that they are being used, and death results to one of the particular parties, every one engaged in such a combat is equally guilty regardless as to whether he used a deadly weapon or not, and regardless as to whether he was on one side or the other makes no difference, and when all are par-

ticipating in a mutual combat, all are equally responsible for the natural consequences." It is submitted: (a) That this was a charge upon the facts in violation of article V, sec. 26 of the Constitution, in that it took from the consideration of the jury the special circumstances under which any of these defendants may have entered said combat; (b) that it was erroneous in that it required the jury to find a party guilty, though he had entered the combat with deadly weapons and solely for the purpose of defending a friend or relative in imminent danger; (c) that it was an erroneous statement of the law.

(8) His Honor erred in charging, "If one of the participants be on one side and the other be slain by participating in a mutual combat, all are equally guilty of the killing." It is submitted: (a) That this was a charge upon the facts in violation of art. V, sec. 26 of the Constitution, in that it took from the consideration of the jury all special facts and circumstances surrounding the entry of any of the parties into such a mutual combat; (b) that it was erroneous in that it would affirm the guilt of one who entered into the combat solely for the purpose of defending his friend or relative from imminent danger; (c) that it was erroneous in that it would affirm the guilt of one who entered a combat the nature of which was such that death was not a probable consequence reasonably to be anticipated; (d) it was an erroneous statement of the law.

*Messrs. Cothran, Dean & Cothran, Haynsworth & Haynsworth,* for Gordon Brown, Doill Huggins and John Humphries, cite: *As to dying declarations:* 58 S. C. 352; 15 Rich. 349, 9231; 14 S. C. 410. *As to dying declarations in favor of accused:* 4th Enc. of Ev. 938; 146 U. S. 140; 46 A. D. 276; 17 S. W. 337; 23 So. 270; 5 Ky. L. R. 203; note to 56 L. R. A. 367-9, and note at 441-2; 56 S. C. 360. *As to mutual combat:* 21 N. E. 121; 14 Rich. 215; 49 S. C. 555; 67 S. C. 323; 49 S. C. 555. *As to defendant using*

*jibe reasonably calculated to cause one to resent them:* 85 S. C. 101; *and ask that the case be reconsidered.*

*Mr. J. R. Martin,* for Tom Harvey and I. A. Williams, cites no authorities.

*Solicitor P. A. Bonham,* for the State, cites no authorities.

January 22, 1918.

The opinion of the Court was delivered by Mr. Chief Justice Gary.

The defendants were indicted for the murder of Davis Freize, and were convicted of manslaughter. Freize was killed in a general fight that took place on the early morning of the 27th of November, 1915, in front of the office of the Judson Mills. A few days before the homicide took place, a labor union was organized among the employees of the mill, and soon thereafter a strike of the weavers was called. A number of the employees joined in the strike, and the mill was closed, and so remained for about 20 days. On November 15th, a large majority of the employees who had become strikers returned for work, and the mill again started its operations. Those who continued on the strike, stationed pickets along the public roadways, about 200 yards from the mill, for the purpose of persuading the employees to join the strikers. There was no trouble until the morning of the 27th of November, when a party of the strikers, after failing in their efforts to influence the employees to join them, left their post and came past the mill office, where several of the workers had gathered. This was in the early morning while it was still dark, and a few minutes after the mill had commenced its work. The strikers and the employees exchanged a few jokes, when the defendant, Harvey (one of the strikers), took exception to some remarks that were made in regard to him, and this led to a fight then and there, in which about four or five strikers and an equal number

of employees took part.    The defendants, Harvey and Williams, were strikers, and the defendants, Brown, Huggins and Humphries, were non-strikers.    As the fight took place while it was still dark, the testimony is confused and conflicting, in regard to what occurred.    Several of the combatants were severely cut, and David Freize (striker) was so badly cut that he did not linger long.    There was testimony to the effect that when the fight commenced, Harvey had a knife, and that a bystander (Tidwell) exclaimed, "Look out, men; Harvey has his knife open;" that he saw the knife, and that Harvey struck at Humphries with it.    In other words, there was testimony tending to show that those who joined in the combat knew that a knife was being used by one of the combatants.    The defendants, Brown, Huggins and Humphries, alone appealed.

These appellants made a motion for a severance, on the ground that their defenses were antangonistic to the defenses of the other two defendants; but the motion was refused, and this is made the basis for the first assignment of error.    It is only necessary to cite the case of *State v. Wade,* 95 S. C. 387, 79 S. E. 106, to show that the exception raising this question cannot be sustained.

The second exception is as follows: "His Honor erred in admitting the testimony of the witness, Hendrix Rector, to the effect that the deceased, David Freize, had stated to him, that Brown and Humphries had cut him, it being submitted that said testimony was hearsay, and that the rule with regard to dying declarations had not been complied with, in that it did not appear that said Freize was in imminent danger of death, and was without hope of recovery."

Hendrix Rector, sheriff of Greenville county, testified as follows:

"Was notified of the killing.    Went to the home of Freize shortly after daylight. * * * Freize said, 'I am cut to

death, and killed,'·or words to that effect. I asked him who
were connected with the difficulty. He said Brown and
Humphries had cut him."

The only reasonable interpretation of the words, "I am
cut to death, and killed," is that the declarant realized that
he was at the point of death, and did not have any hope of
recovery. It will be observed that he not only stated that
he was cut to death, but that he was killed. The appellants'
attorneys rely upon the case of *State v. Belcher,* 13 S. C.
459, in which the Court uses the following language:

"Hearsay is evidence of facts with which the witness is
not acquainted, but which he merely states from the relation
of others, and is inadmissible for the double reason that the
party originally stating the facts does not speak under oath,
and the party against whom the evidence is offered has no
opportunity to cross-examine the party making the state-
ments. The only case in the whole range of the criminal
law, where evidence is admissible against the accused with-
out an· opportunity of cross-examination, is that of 'dying
declarations' in cases of homicide, and they are only admis-
sible from the necessity of the case, and when made *in
extremis,* when the party is at the point of death, and is
conscious of it, when every hope of this world is gone, and
every motive to falsehood is silenced by the most powerful
considerations to speak the truth. For the reason that the
admission of such statement is exceptional, they ought
always to be excluded unless they come within the rule in
every respect. *State v. Quick,* 15 Rich. 342; *State v.
McEvoy,* 9 S. C. 211; Roscoe's Cr. Ev. 31. The testimony
of Dr. Harrison as to the statements of the deceased to him
does not come within the definition of dying declarations,
and was mere hearsay. ·He did not witness the acts com-
plained of, but only related what she ·told him had taken
place. She was afflicted with a lingering disease. Her
statement was made April 21st, and she did not die until
July 12, nearly three months after. It does not appear that

the statement was made *in extremis;* she said she thought at the time that the violence was inflicted that 'she would then die,' but she did not say that, at the time she made the statement, she considered herself in the very presence of death, soon to occur."

The difference between this case and that of *State v. Belcher,* 13 S. C. 459, is clearly pointed out by the Court when it says:

"She said she thought at the time the violence was inflicted that 'she would then die,' but she did not say that at the time she made the statement she considered herself in the very presence of death, soon to occur;" whereas, the words in the present case indicate a consciousness of approaching death, and the abandonment of all hope.

The third exception is as follows:

"That, having admitted the testimony of the said Hendrix Rector, to the effect that the said Freize had stated to him that Brown and Humphries (meaning the defendants) had cut him, his Honor erred in refusing to admit the testimony of Miss Alice Agnew (head nurse at the hospital), to the effect that said Freize had subsequently, while in the hospital, stated to her in reply to the question as to who cut him, that he did not know; it was dark. It being submitted that said testimony was admissible upon the following grounds:  (a) The Judge admitted the statement made by Freize to Hendrix Rector a short time previous as a dying declaration, and it was not shown that any change had taken place in the condition of the said Freize, or that he had, subsequent to the statement to Rector, entertained any hope of recovery. (b) It is submitted that said statement to Miss Agnew was competent, in contradiction of the previous statement made by Freize, whether regarded as a dying declaration or otherwise."

We will consider, first, subdivision (a). It is incumbent on the party offering to introduce in evidence a dying decla-

ration to show that it fulfills the requirements of the law; and the mere fact that declarations may have been made on a previous occasion, under such circumstances as rendered them admissible, is not sufficient to show that the subsequent declarations are admissible. *State v. Belcher,* 13 S. C. 459. The record discloses the fact that the declarations made to Rector were at the home of the deceased, shortly after daylight, on the morning of the homicide, but that those subsequently made to Miss Alice Agnew were at the city hospital. It does not, however, appear how much time elapsed between the two declarations. Under such circumstances, the ruling of his Honor, the presiding Judge, is free from error.

The next question to be determined is whether subdivision (b) can be sustained. In the case of the *State v. Taylor,* 56 S. C. 360, 34 S. E. 939, the Court decided that dying declarations cannot be impeached by statements, made by the deceased to another party, at another time, and not under shadow of impending death. The reasons assigned are as follows:

"To hold that it is competent to impeach the dying declarations of a deceased person by testimony tending to show that she had made statements in conflict with those contained in her dying declarations, not under the sanction of an oath, nor under the shadow of impending death, would tend, not only to afford a strong temptation to the fabrication of false testimony, to save the life of the accused, when death had rendered it impossible to rebut or explain such statements, but would also tend to absolutely destroy the efficiency of dying declarations as evidence."

The decision is reaffirmed in *State v. Stuckey,* 56 S. C. 576, 35 S. E. 263. Those cases are conclusive of the questions under consideration.

All the other exceptions (which will be reported) relate to the law of mutual combat, and the questions presented by

them must be determined, in connection with the following
requests which were charged: "That, to constitute
mutual combat, it is not necessary that there should
be a positive agreement between the participating
parties to enter the combat; it is sufficient if they wilfully
enter into the conflict, upon the impulse of the moment. If
one comes to the assistance of his friend or relative, and
takes part in a difficulty in which such friend or relative is
engaged, he enters the combat upon the same footing of the
person to whose assistance he comes, and under the same
legal status." *State v. Cook,* 78 S. C. 253, 59 S. E. 862,
15 L. R. A. (N. S.) 1013, 125 Am. St. Rep. 788, 13 Ann.
Cas. 1051.

"That every one is presumed to know the consequences
of his act, and if one voluntarily enters a mutual combat
where deadly weapons are used, knowing that they are being
used, and death results to one of the participating parties,
every one engaged in such combat is equally guilty, regard-
less of whether he used a deadly weapon or not. And
regardless of whether he was on one side or the other makes
no difference, and where all are participating in the mutual
combat, all are equally responsible for the natural conse-
quences."

"One who sees another attacked by great force, and his
life endangered or subjected to serious bodily harm, has a
right to interfere to prevent death or serious bodily harm,
and one has the right to interfere to the extent of taking the
life of the assailant."

"If one lawfully interferes to prevent a homicide or seri-
ous bodily harm, from being imposed upon a third party,
inadvertently strikes a bystander, and death results, if in
good faith such party inadvertently struck the bystander to
prevent a felony, such person would not be guilty of any
crime. It would be an accident."

"If A is in company with B and B is set upon by a mob,
and B's life endangered, A would have a right to interfere

to the extent of taking life of any member of the mob, in order to prevent death of B or serious bodily harm being done to B."

"When no conspiracy has been shown to have existed between the actual perpetrators and the one charged with aiding, it is essential to the guilt of the latter that he should not only have been present when the killing was done, but should have actually participated in the crime."

"Although it may be positively proven that one or two or more persons committed a crime, yet if it is uncertain which is the guilty party, all must be acquitted. No one can be convicted till it is established that he is the party who committed the offense."

"Court: I charge you that, gentlemen, if there was the absence of an agreement to have mutual combat. Where people agree to have a mutual combat, they are engaged in an unlawful act; they are all presumed to intend the consequences which naturally flow from an unlawful act; and, if one of the participants be on one side himself and the other be slain by participating in the mutual combat, all are equally guilty of the killing."

The case of *State v. Lee*, 85 S. C. 101, 67 S. E. 141, 137 Am. St. Rep. 869, shows that the fifth exception cannot be sustained.

When the fourth, sixth, seventh and eighth exceptions are considered in connection with the entire charge, it will be seen that they must be overruled. Instead of being prejudicial to the appellants, the charge was too favorable to them. Affirmed.

MESSRS. JUSTICES HYDRICK, WATTS and GAGE concur.

MR. JUSTICE FRASER, *dissenting.* I cannot concur with the majority of the Court, in their opinion as to admission of the declaration of the deceased. A witness for the prosecution was put on the stand, who said:

"Freize said, 'I am cut to death and killed,' or words to that effect. I asked him who were connected with the difficulty? He said Brown and Humphries had cut him."

Upon this statement the testimony was admitted. The rule in this State is, death must be imminent at the time the declaration is made, and the deceased must be so fully aware of this as to be without hope of life. Dr. Davis said:

"He was dying when I saw him. I had no hope for him; told him I didn't think he was going to live. . He said he did not think he was going to die; didn't think he would be able to get to Court that week, but would not make a dying statement. Death was imminent, but it is evident to me that the deceased was not without hope of life."

Some people use the strongest language they know on all occasions, and it seems to me that something further should be shown than "I am killed," especially when the two physicians say, in effect, that the hope of life was so strong that the deceased did not believe their statement that he would die, but, on the contrary, expected an early recovery.

If the statement of the sheriff was allowed, then I think the statement of the nurse should also have been admitted. Death was nearer. Now eliminate the testimony of the doctors, as I think we must do, to allow the dying declaration at all; then there is a presumption that a condition once shown to exist continues until a change is shown. The first statement was made while the heat of battle had little time to cool. The latter statement was made after there was time for reflection. The second statement was by the nurse: " 'I said, who cut you?' He said, 'I don't know, it was dark.' " A free fight and a dark night makes the second statement highly probable.

We are considering rules for other cases, as well as this case. I do not think this is in conflict with the cases cited in the majority opinion. The danger of the "fabrication of false testimony" is greater with the prosecution than the defense. Unless the deceased is permitted to live only a few

minutes, he is likely to die surrounded by his friends. It may be a fearful weapon in the hands of the prosecution, and leave the defendant powerless to protect himself against its use.