HUFF, J.:
**429 Aaron Young, Jr. appeals his convictions of murder and attempted murder. On appeal, Young, Jr. argues the trial court erred in denying: (1) his motion for a directed verdict on the murder charge because the State's mutual combat theory was not supported by South Carolina law or the evidence at trial; (2) his request for a jury charge on the end of mutual combat; and (3) his motion for a directed verdict on the attempted murder charge. We affirm.
**430 FACTS AND PROCEDURAL HISTORY
In October 2014, Young, Jr. was indicted for the murder of Khalil Singleton (Victim) and the attempted murder of Tyrone Robinson. The indictment arose out of a September 1, 2012 conflict between Young, Jr. and Robinson, which culminated in the death of Victim, a minor who was playing outside on a trampoline during the incident. The State's theory of prosecution was that Young, Jr. engaged in mutual combat with Robinson and thereby caused Victim's death.[1]
Prior to trial, Young, Jr. moved to quash the murder indictment, arguing mutual combat is not a criminal offense in South Carolina. Young, Jr. further argued the doctrine of transferred intent does not apply in the context of mutual combat. The trial court deferred ruling on the motion until it could "get some sensible legal theory on one side of that issue or another which makes the transferred intent doctrine applicable in mutual combat."
Jontu Singleton testified he met with Robinson on the afternoon of the incident at a house in Hilton Head. The two men decided to drive Robinson's car to the Youngs' residence.
*489 When Robinson and Singleton arrived at the house, Young, Sr. and Young, Jr. were both outside. Robinson exited his vehicle carrying a .38 caliber revolver and began yelling at Young, Jr. Young, Sr. saw the gun and immediately began to struggle with Robinson. Robinson fired the gun during the struggle, and Young, Sr. backed away; Robinson proceeded to fire one or two more shots at the ground. Robinson then returned to his vehicle and sped away; Singleton remained with the Youngs. Immediately after Robinson fled the yard, the Youngs went into their house and retrieved a semi-automatic pistol and ammunition. The Youngs and Singleton then entered Young, Sr.'s gray pickup truck and began to search for Robinson. Young, Sr. drove the truck, and Young, Jr. assembled the pistol in the passenger seat. The three men drove around their neighborhood for approximately ten minutes, but they could not find Robinson. Singleton then exited the vehicle and left the area.
**431 Charlese Mitchell, Robinson's neighbor, testified she was home alone on the day of the incident and heard several rounds of gunshots around 4:00 p.m. After the gunfire stopped, Robinson came to her door "hyped up" and carrying a gun.
Robinson entered Mitchell's trailer and stated "those [people were] shooting at me." At that time, Tyrone Delaney, Mitchell's fiancé, came home and spoke with Robinson for no more than ten minutes. Delaney told Robinson to leave, and shortly after Robinson left, Mitchell and Delaney heard another series of rapid gunfire. Mitchell testified that she saw Young, Sr. and a passenger she could not identify speeding down the road in a gray truck when she went outside to tell her son and stepsons to come inside the trailer. After returning indoors with her children, Mitchell heard three final gunshots followed by screaming. Mitchell went outside to see Victim lying on the ground.
Delaney testified he observed the Youngs' gray truck speeding out of Mitchell's neighborhood at approximately 4:00 p.m. When Delaney arrived at Mitchell's trailer, Robinson explained he and the occupants of the truck had exchanged gunfire. At that point, Delaney asked Robinson to leave. Shortly after Robinson left, Delaney heard a burst of semi-automatic gunfire, and he and Mitchell brought their children inside. A few minutes later, Delaney heard three more gunshots, of a different type than the semi-automatic shots. When the gunfire ceased, Delaney heard Victim screaming for help.
The State also published Young, Jr.'s police interview to the jury. In his interview, Young, Jr. stated, "The first time we caught [Robinson] ... the [pistol] wouldn't shoot. It wouldn't shoot." Young, Jr. continued, "It didn't go down like we wanted it to. If it wouldn't went down like that, we wouldn't even be here and nobody would know nothing [because] it was a dead[-end] road.... But the [pistol] just wouldn't go off." Later in the interview, when an investigator asked Young, Jr. who he was shooting at, he indicated Robinson was his target.
Young, Jr. did not testify in his own defense, and the jury found him guilty of both charges. The trial court sentenced Young, Jr. to concurrent terms of thirty years' imprisonment. This appeal followed.
**432 DIRECTED VERDICT-MUTUAL COMBAT THEORY
First, Young, Jr. argues the trial court erred in denying his motion for directed verdict because South Carolina law does not support a murder conviction under a mutual combat theory. Young, Jr. asserts South Carolina does not recognize mutual combat as a basis for a murder conviction, and the law of mutual combat is only a limitation on self-defense.
"A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged." State v. McHoney , 344 S.C. 85, 97, 544 S.E.2d 30, 36 (2001). In reviewing a motion for directed verdict, the trial court is concerned with the existence of evidence, not with its weight. State v. Mitchell , 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000).
When a motion for a directed verdict is made in a criminal case where the State relies exclusively on circumstantial evidence, "[t]he trial [court] is required to submit the case to the jury if there is any substantial evidence which reasonably *490 tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced."
State v. Lollis , 343 S.C. 580, 584, 541 S.E.2d 254, 256 (2001) (quoting Mitchell , 341 S.C. at 409, 535 S.E.2d at 127 ). "On appeal from the denial of a directed verdict, this [c]ourt must view the evidence in the light most favorable to the State." State v. Burdette , 335 S.C. 34, 46, 515 S.E.2d 525, 531 (1999). "If there [was] any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, [this court] must find the case was properly submitted to the jury." State v. Weston , 367 S.C. 279, 292-93, 625 S.E.2d 641, 648 (2006).
"The doctrine of mutual combat has existed in South Carolina since at least 1843, but has fallen out of common use in recent years." State v. Taylor , 356 S.C. 227, 231, 589 S.E.2d 1, 3 (2003). To constitute mutual combat, there must exist a mutual intent and willingness to fight. State v. Graham , 260 S.C. 449, 450, 196 S.E.2d 495, 495 (1973). The intent to fight may be manifested by the acts and conduct of the parties and the circumstances surrounding and leading up to the combat. Id ., 196 S.E.2d at 495-96. In addition, there must be an antecedent agreement to fight, which may be shown by evidence establishing a pre-existing dispute or ill will between **433 the combatants. See Taylor , 356 S.C. at 233-34, 589 S.E.2d at 4-5. Finally, the combatants must be armed and know the other party is armed. Id ., 589 S.E.2d at 4-5.
In State v. Andrews , our supreme court upheld a jury charge which stated, "[W]here two persons mutually engage in combat, and one kills another, and at the time of the killing it be maliciously done, it is murder; if it be done in sudden heat and passion upon sufficient provocation without premeditation or malice, it would be manslaughter." 73 S.C. 257, 260, 53 S.E. 423, 424 (1906).
In State v. Brown , our supreme court relied on the doctrine of mutual combat to uphold the manslaughter convictions of multiple defendants. 108 S.C. 490, 95 S.E. 61 (1918). In Brown , approximately ten men engaged in a fight and as a result, one of the combatants died from knife wounds. Id . at 494, 95 S.E. at 62. At least five of the combatants were charged with murder in relation to the fight. Id . at 490, 95 S.E. at 62. On appeal, three defendants argued the trial court erred in charging the jury that all combatants could be convicted under a theory of mutual combat. Id . at 493, 95 S.E. at 61. The supreme court affirmed the convictions and approved the following jury charge:
That every one is presumed to know the consequences of his act, and if one voluntarily enters a mutual combat where deadly weapons are used, knowing that they are being used, and death results to one of the participating parties, every one engaged in such combat is equally guilty, regardless of whether he used a deadly weapon or not. And regardless of whether he was on one side or the other makes no difference, and where all are participating in the mutual combat, all are equally responsible for the natural consequences.
Id . at 499, 95 S.E. at 63.
In State v. Mathis , a defendant was indicted for murder. 174 S.C. 344, 345, 177 S.E. 318, 318 (1934). The evidence showed "the [defendant] and the deceased were on the lookout for each other; that they were armed in anticipation of a combat; that each drew his pistol and fired upon the other." Id . at 348, 177 S.E. at 319. The State proceeded on the theory of mutual combat, and the trial court instructed the jury on the law of mutual combat. Id . On appeal, our supreme court found there **434 was no error because the evidence surrounding the mutual combat "justified a verdict of premeditated murder." Id . at 348-49, 177 S.E. at 319.
Although we acknowledge the doctrine of mutual combat has "fallen out of common use in recent years," we find South Carolina law still recognizes mutual combat as a basis for a murder charge. See Taylor , 356 S.C. at 231, 589 S.E.2d at 3. Our supreme court has repeatedly recognized mutual combat as a basis for a murder charge. See Andrews , 73 S.C. at 260, 53 S.E. at 424 (upholding jury instructions stating "where two persons mutually engage in combat, and one kills another, and at the time of the killing it be maliciously done, it is murder; if it be done in sudden heat and passion upon *491 sufficient provocation without premeditation or malice, it would be manslaughter."); Mathis , 174 S.C. at 348-49, 177 S.E. at 319 (holding a murder charge was proper where evidence showed the defendant and the deceased engaged in mutual combat). Specifically, in Brown , our supreme court upheld a trial court's ruling that multiple defendants involved in mutual combat could be charged with murder for the death of a participating party. 108 S.C. at 499, 95 S.E. at 63. Based on the foregoing, we find the trial court did not err in finding mutual combat a viable theory of prosecution for the murder charge.
Second, Young, Jr. argues the trial court "erroneously further complicated matters" by combining the issue of transferred intent with the theory of mutual combat. Unlike the victims in Andrews , Mathis , and Brown , here, Victim was an innocent bystander rather than a combatant, and thus, Young, Jr. asserts he cannot be held criminally responsible because Robinson fired the fatal shot.
We find the trial court did not err in applying the doctrine of transferred intent to Young, Jr.'s case. It is undisputed Robinson fired the final three shots at the Youngs as they fled his neighborhood for the final time; one of those three shots fatally struck Victim. Because Robinson fired at Young, Jr. with the intent to kill, this intent transferred to Victim. Thus, Robinson was criminally responsible for Victim's death under the doctrine of transferred intent. See e.g. , State v. Horne , 282 S.C. 444, 446, 319 S.E.2d 703, 704 (1984) ("If **435 there was malice in [the actor's] heart ... it matters not whether he killed his intended victim or a third person through mistake.... [T]he actor's intent to kill his intended victim is said to be transferred to his actual victim."). Furthermore, under the theory of mutual combat, all combatants are deemed "equally responsible for the natural consequences" of their actions during combat, and all may be held equally guilty of murder when a combatant dies, regardless of which combatant fired the fatal shot. See Brown , 108 S.C. at 499, 95 S.E. at 63. Therefore, despite the fact that Victim was a bystander rather than a combatant, we find Young, Jr. could still be found guilty for Victim's death as a "natural consequence" of the combat with Robinson. This is especially true under the instant facts because Young, Jr. admitted to police that he knew children were bystanders during the combat; specifically, Young, Jr. stated, "I saw the [children playing on the] trampoline and all.... In order to ride up the road, you [have to] pass by the children." The Youngs chased Robinson into his neighborhood while firing shots, including shots from the semi-automatic weapon Young, Jr. retrieved and assembled for use in the pursuit. Robinson fired his shots at the Youngs as they fled when Young, Jr.'s weapon jammed-after Young, Jr.'s rapid firing of some twenty shots to "swiss cheese" Robinson's car. Accordingly, we find the trial court did not err in allowing the State to proceed under the theory of mutual combat even where Young, Jr. did not fire the shot that killed Victim, a bystander.
Finally, Young, Jr. argues no evidence at trial supported a finding of mutual combat. Here, Young, Jr. asserts there was no mutual agreement or willingness to fight, but rather a string of shootings over the course of approximately one hour, in which Young, Jr. and Robinson never engaged in combat at the same time. We find the State presented direct and substantial circumstantial evidence of each of the necessary elements of mutual combat. See Weston , 367 S.C. at 292-93, 625 S.E.2d at 648 ("If there [was] any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, [this court] must find the case was properly submitted to the jury.").
To constitute mutual combat, there must exist a mutual intent and willingness to fight. See **436 Graham , 260 S.C. at 450, 196 S.E.2d at 495. The intent to fight may be manifested by the acts and conduct of the parties and the circumstances surrounding and leading up to the combat. Id . at 450, 196 S.E.2d at 495-96. We find there was evidence of a mutual intent and willingness to fight. Robinson first fired two or three shots at the Youngs' feet, and the Youngs retrieved a weapon and gave chase. Although Young, Jr. did not shoot Robinson during the conflict, he did shoot Robinson's parked vehicle approximately *492 twenty times. Moreover, Robinson admitted to Mitchell and Delaney that he shot back at the Youngs as they pursued him in their vehicle. Robinson also fired the final three shots at the Youngs' vehicle as they fled the neighborhood for the final time. Based on these circumstances, we find there was evidence showing Robinson and Young, Jr. had a mutual intent to engage in combat.
In addition, there must be an antecedent agreement to fight, which may be shown by evidence establishing a pre-existing dispute or ill will between the combatants. See Taylor , 356 S.C. at 233-34, 589 S.E.2d at 4-5. In the police interview, Young, Jr. explained he and Robinson did not like each other and had been involved in numerous previous altercations. Young, Jr. specifically recalled that Robinson attempted to kill him a few days prior to the instant conflict. Viewing Young, Jr.'s admissions in a light most favorable to the State, we find this second element satisfied.
Finally, the combatants must be armed and know the other party is armed. Id . Here, the evidence showed both Young, Jr. and Robinson were armed and knew the other to be armed. Singleton testified Robinson carried a .38 caliber revolver, which he shot at the Youngs' feet. Soon after, Young, Jr. retrieved a semi-automatic pistol and ammunition. Mitchell and Delaney each testified Robinson excitedly told them that he and the Youngs exchanged gunfire as the Youngs drove their truck around in search of Robinson. Young, Jr. admitted he was armed with the semi-automatic pistol when he cornered Robinson on a dead-end road and later shot Robinson's vehicle. Young, Jr. further stated he was aware Robinson fired three shots in his direction as the Youngs fled the scene for the final time. Viewing this testimony in a light most favorable to the State, we find this third element satisfied.
**437 Accordingly, because the doctrine of mutual combat is a proper basis for a murder charge and the State presented substantial circumstantial evidence showing Young, Jr. engaged in mutual combat, we find the trial court properly submitted the case to the jury. See Weston , 367 S.C. at 292-93, 625 S.E.2d at 648 ("If there [was] any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, [this court] must find the case was properly submitted to the jury.").
JURY CHARGE-END OF MUTUAL COMBAT
Young, Jr. argues the trial court erred in denying his request for a jury charge on the end of mutual combat. Young, Jr. asserts the evidence at trial supported such a charge because Young, Jr. fled the scene after shooting Robinson's vehicle, and the jury could have found this ended the mutual combat. We disagree.
Where a person voluntarily participates in ... mutual combat for purposes other than protection, he cannot justify or excuse the killing of his adversary in the course of such conflict on the ground of self defense ... unless, before the homicide is committed, he withdraws and endeavors in good faith to decline further conflict, and, either by word or act, makes that fact known to his adversary ....
Graham , 260 S.C. at 451, 196 S.E.2d at 495-96 (emphasis added) (quoting 40 C.J.S. Homicide § 122, p. 496).
We find the trial court did not abuse its discretion in declining to charge the jury on the end of mutual combat. State v. Mattison , 388 S.C. 469, 479, 697 S.E.2d 578, 584 (2010) ("An appellate court will not reverse the trial [court]'s decision regarding a jury charge absent an abuse of discretion.").
First, the evidence did not show Young, Jr. withdrew from the conflict and in good faith declined further conflict. Young, Jr. and Robinson engaged in a shoot-and-flee conflict that began when Robinson fired several shots at the ground in the Youngs' yard. The conflict continued as the Youngs drove around two neighborhoods searching for Robinson. Over the course of the search, Young, Jr. cornered Robinson on a dead-end road but did not shoot him because Young, Jr.'s weapon jammed; Young, Jr. also shot Robinson's unoccupied vehicle over twenty times while Robinson hid nearby. Moreover, both **438 Mitchell and Delaney testified Robinson excitedly told them he shot back at the Youngs during this time period. Furthermore, *493 Young, Jr. admitted in his police interview that he intended to continue the conflict, stating, "[Robinson] knew we were [going to] come back for him. He already knew. I know he knew.... He know[s] me. I don't play like that." Young, Jr. further told Young, Sr. to "turn around" after hearing Robinson fire the final three shots toward their vehicle. Based on the unique nature of the shoot-and-flee conflict Young, Jr. and Robinson engaged in, we find the evidence did not show Young, Jr. withdrew from the combat by fleeing the neighborhood before Robinson fired the fatal shots.
Second, no evidence suggested Young, Jr. made his withdrawal known to Robinson, either by word or act. Here, no evidence showed Young, Jr. and Robinson communicated verbally at any point in the conflict after the initial encounter in the Youngs' yard. Moreover, because we find the combat did not end when Young, Jr. fled the scene after shooting Robinson's unoccupied vehicle, we similarly find Young, Jr.'s act of fleeing before Robinson fired the fatal shots did not make known to Robinson any intent to withdraw.
Because the evidence did not show Young, Jr. withdrew from the combat in good faith or make any withdrawal known to Robinson, we find a charge on the end of mutual combat was not warranted. See State v. Knoten , 347 S.C. 296, 302, 555 S.E.2d 391, 394 (2001) ("The law to be charged must be determined from the evidence presented at trial."). Accordingly, we find no abuse of discretion by the trial court.
DIRECTED VERDICT-ATTEMPTED MURDER
Young, Jr. argues the trial court erred in denying his motion for a directed verdict on the attempted murder charge. Young, Jr. asserts the State failed to produce substantial circumstantial evidence showing he attempted to murder Robinson. Specifically, Young, Jr. asserts the evidence at trial showed Robinson was not present when Young, Jr. shot Robinson's car, and there was no evidence Young, Jr. ever pointed his gun at or tried to shoot Robinson. Young, Jr. therefore concludes the trial court should have granted his motion for a directed verdict. We disagree.
**439 "A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged." McHoney , 344 S.C. at 97, 544 S.E.2d at 36. In reviewing a motion for directed verdict, the trial court is concerned with the existence of evidence, not with its weight. State v. Mitchell , 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000).
The trial court properly denied Young, Jr.'s motion for a directed verdict on the attempted murder charge because the State presented substantial circumstantial evidence demonstrating Young, Jr.'s guilt. See State v. Burdette , 335 S.C. 34, 46, 515 S.E.2d 525, 531 (1999) ("On appeal from the denial of a directed verdict, this [c]ourt must view the evidence in the light most favorable to the State."); Weston , 367 S.C. at 292-93, 625 S.E.2d at 648 ("If there [was] any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, [this court] must find the case was properly submitted to the jury.").
Here, Singleton testified after Robinson first fired his revolver at the ground near the Youngs, the Youngs went into their house and retrieved a semi-automatic pistol. Thereafter, Singleton and the Youngs drove around their neighborhood searching for Robinson, and Young, Jr. assembled the pistol during the search. Mitchell testified Robinson came to her door and excitedly told her the Youngs were shooting at him. Delaney also testified Robinson told him about an exchange of gun fire with the Youngs. Moreover, the State published Young, Jr.'s police interview to the jury. In the interview, Young, Jr. explained, "The first time we caught [Robinson] ... the [pistol] wouldn't shoot. It wouldn't shoot." Young, Jr. continued, "It didn't go down like we wanted it to. If it wouldn't went down like that, we wouldn't even be here and nobody would know nothing [because] it was a dead[-end] road.... But the [pistol] just wouldn't go off." Young, Jr. also clarified Robinson was his intended target. Viewing this evidence in the light most favorable to the State, we find there was substantial circumstantial evidence *494 tending to prove Young, Jr. attempted to murder Robinson. See Lollis , 343 S.C. at 584, 541 S.E.2d at 256 ("When a motion for a directed verdict is made in a criminal case where the State relies exclusively on circumstantial evidence, the trial [court] is required to submit the case to the jury if there is any **440 substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced." (quoting Mitchell , 341 S.C. at 409, 535 S.E.2d at 127 ) ). Thus, we find the trial court properly denied Young, Jr.'s motion for a directed verdict.
CONCLUSION
Accordingly, Young Jr.'s convictions are
AFFIRMED.
GEATHERS and MCDONALD, JJ., concur.

It is undisputed that Robinson fired the shot that killed Victim.