# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Joseph Bowers, Appellant.

Appellate Case No. 2014-002176

Appeal From Beaufort County
R. Markley Dennis, Jr., Circuit Court Judge

Opinion No. 5677
Heard October 10, 2018 – Filed August 7, 2019

## REVERSED AND REMANDED

Chief Appellate Defender Robert Michael Dudek, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Assistant
Attorney General Mark Reynolds Farthing, both of
Columbia; and Solicitor Isaac McDuffie Stone, III, of
Bluffton, all for Respondent.

**GEATHERS, J.:** Late night verbal altercations at a local club escalated to a
shootout, resulting in the death of two people, Dante Bailey and Michael Morgan,
and the injury of two others, Robert Goodwine and Richard Green. Appellant Joseph
Bowers was convicted for the (1) voluntary manslaughter of Michael Morgan, (2)
assault and battery of a high and aggravated nature of Richard Green, and (3)
possession of a weapon during the commission of a violent crime. Bowers argues
the circuit court erred by instructing the jury on mutual combat and voluntary

manslaughter because there is no evidence to support either charge.  We reverse and remand for a new trial.

## FACTS/PROCEDURAL HISTORY

On June 21, 2012, Stanley Humphries and Dante Bailey were playing pool at the Sand Dollar in St. Helena.  After the Sand Dollar closed for the night, the two left and went to Bailey's house to pick up some cigarettes before heading to a local club, Midnight Soul Patrol.  Appellant met Humphries and Bailey at Bailey's house, and the group rode in Humphries' car to the club.  The group went inside the club but was inside for only a few minutes before walking outside to smoke.  Arthur Chaplin and a group of men approached Bailey, and Bailey and Chaplin started arguing.

Humphries testified the argument was only verbal and ended soon after it started.  Other witnesses testified similarly.  Mangum Smalls stated he saw Bailey and Chaplin arguing and guns were flashed, then Derrick Grant got between the two and defused the situation.  Joe Pope testified he saw the argument between Bailey and a group of men and it was defused quickly.  Alvin Wilson, the DJ at the club, noticed the crowd was moving outside and when he followed, he saw the altercation.  As a result, Wilson declared the party over and walked back inside.

After the altercation was abated, someone suggested leaving, and Humphries, Bailey, and Appellant walked back to Humphries' car, attempting to leave.  Meanwhile, Pope turned to walk into the club and saw a separate altercation between **Lucas** Morgan and Irvin Smalls, unrelated to Bailey and Chaplin's altercation.  According to Pope, Irvin was trying "to get to Lucas," but Lucas had a gun.  At that time, Humphries, Appellant, and Bailey had returned to Humphries' car, but Bailey was standing outside of the car directing Humphries out of the parking spot to avoid hitting nearby obstacles.

Then the gunshots began, precipitated by **Michael** Morgan inexplicably firing a flare gun.[1]  Bailey was shot.  Humphries and Appellant exited the car and Bailey was on the ground, having been hit by a bullet that perforated his heart and a lung.  Mangum Smalls testified that he saw Appellant trying to help put Bailey inside of a

---

[1] There was testimony that Lucas Morgan, Michael Morgan, Richard Green and Alvin Wilson were all related.

car and noticed Appellant was holding Bailey's gun.[2]  Richard Green, who had his back to the club and was outside of the club owner's nearby house, heard the first shot and attempted to flee.  He was shot in the back and paralyzed from the waist down.  Robert Goodwine walked outside of the club as the gunshots began and saw Green lying on the ground.  Goodwine saw Lucas and Bailey shooting and attempted to flee towards the main road when Lucas "came around the corner shooting," hitting Goodwine in his left calf.  Pope testified that shortly after the shots began, a group of four or five men ran towards Michael Morgan shooting while Michael was standing over Green with a flare gun.  Michael was then hit by a bullet, but no one saw who shot Michael.  The bullet struck Michael in his hip, perforated his iliac vein, and he died hours later.  All of the injuries were the result of "through and through" shots, meaning a projectile passed completely through the body.

Once the shooting stopped, Pope called 911.  Paul Adam, a deputy with the Beaufort County Sheriff's Office, was dispatched to the club and arrived thirteen minutes later.  Deputy Adam collected evidence—including spent shell casings, a Glock handgun, and a flare gun—and turned the evidence over to the lead investigator, Adam Zsamar.  Deputy Adam also told Investigator Zsamar that three people had guns—Bailey, Lucas Morgan, and Lewis Johnson.  Investigator Zsamar processed the scene and located two sets of different brand nine–millimeter shell casings, one set clustered near where Lucas Morgan was seen firing and the other set clustered near where Appellant and Bailey were placed.  The day after the shooting, Investigator Zsamar executed a search warrant at Lucas Morgan's residence and found the same brand of ammunition that was clustered near where witnesses placed Lucas Morgan.  Further investigation also revealed that the Glock recovered from the scene was registered to Bailey.

Jeremiah Fraser, an investigator with the Beaufort County Sheriff's Office, interviewed Appellant on the day after the shooting.  Appellant's version of events was similar to Humphries' version.  Appellant told investigators that he was at the club with Bailey and Bailey got into an argument with someone.  Appellant said he pulled Bailey away from the argument and towards the car so they could leave but then "shots started ringing out towards them," and that's when Bailey pulled out his gun, stepped out from behind the car, and was shot.  Appellant denied shooting a

---

[2] Mangum Smalls initially testified that he witnessed Appellant with a gun prior to when Appellant was trying to help put Bailey inside of the car.  However, once presented with his previous deposition testimony, Smalls corrected himself and testified he did not see Appellant firing a gun and only witnessed Appellant holding Bailey's gun after Bailey had been shot.

gun, and his clothes were collected for gunshot residue testing. Also, Appellant's hands were swabbed for gunshot residue, but the swabs were never tested because they were collected outside of the six-hour window in which gunshot residue can be expected to be found on living tissue, according to expert testimony. Appellant was jailed after the interview, and his shirt and shorts later tested positive only for lead particles.[3] According to one of the South Carolina Law Enforcement Division (SLED) agents, authorities did not test Michael Morgan or Dante Bailey for gunshot residue because they were classified as victims. After being jailed, Appellant chose to speak with investigators again and said that someone else was shooting. While awaiting trial, Appellant had a conversation with his girlfriend on a prison telephone that recorded him saying "I ain't killed the boy, I only shot the boy."

Appellant was tried for the murders of his friend Dante Bailey and Michael Morgan, the attempted murders of Robert Goodwine and Richard Green, and possession of a weapon during the commission of a violent crime. However, after trial but before jury deliberations began, the State withdrew the murder indictment for Bailey and proceeded on the remaining indictments.[4] Over Appellant's objection, the circuit court instructed the jury on mutual combat and told the jury the doctrine applied only to Michael Morgan's murder. The circuit court also instructed the jury on the lesser-included offenses of voluntary manslaughter and assault and battery of a high and aggravated nature. Appellant objected to the voluntary manslaughter jury instruction. Additionally, Appellant requested a self-defense instruction that was also given.

Ultimately, the jury found Appellant guilty of the voluntary manslaughter of Michael Morgan, the assault and battery of a high and aggravated nature of Richard Green, and possession of a weapon during commission of a violent crime. This appeal followed.

## ISSUES ON APPEAL

1. Did the circuit court err by instructing the jury on mutual combat?

_____

[3] An expert testified that lead is one of three main components of gunshot residue, the others being barium and antimony. Unless the test returns positive results for all three components, the components found cannot be called gunshot residue.

[4] The court allowed the jury to deliberate on Appellant's indictment for the attempted murder of Robert Goodwine, despite Goodwine's testimony that Lucas Morgan shot him and the circuit court's instruction that the theory of mutual combat did not apply to Goodwine.

2. Did the circuit court err by instructing the jury on voluntary manslaughter?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Wharton*, 381 S.C. 209, 213, 672 S.E.2d 786, 788 (2009). "In general, the trial judge is required to charge only the current and correct law of South Carolina . . . and the law to be charged to the jury is determined by the evidence at trial." *State v. Taylor*, 356 S.C. 227, 231, 589 S.E.2d 1, 3 (2003) (citation omitted). Unless justified by the evidence, an instruction should not be given because it can confuse the jury. *State v. Commander*, 384 S.C. 66, 75, 681 S.E.2d 31, 36 (Ct. App. 2009), *aff'd as modified*, 396 S.C. 254, 721 S.E.2d 413 (2011). But an instruction must be erroneous and prejudicial to warrant reversal. *Taylor*, 356 S.C. at 231, 598 S.E.2d at 3.

## LAW/ANALYSIS

### I.    Issue Preservation

As a threshold matter, the State contends the jury instruction issue is not preserved for appellate review and Appellant waived his objection by failing to raise specific grounds. Specifically, the State argues that after the off-the-record charge conference, Appellant "generally objected" to the jury instruction but "did not provide any grounds in support of those objections" during the on-the-record charge conference. We disagree.

Issue preservation rules are "meant to enable the lower court to rule properly after it has considered all relevant facts, law, and arguments." *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000). But issue preservation is not a "gotcha" game. *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012). Instead of being hyper-technical, we approach preservation with a practical eye. *Herron v. Century BMW*, 395 S.C. 461, 470, 719 S.E.2d 640, 644 (2011). Once a party objects to a jury charge and, after opportunity for discussion, is denied on the record, no further action is necessary in order to preserve the issue for appeal. *State v. Johnson*, 333 S.C. 62, 64 n.1, 508 S.E.2d 29, 30 n.1 (1998). The failure to raise specific grounds for an objection will not prevent the appellate court from addressing an issue when the record indicates that the trial court and the State understood the basis for the objection. *State v. Hendricks*, 408 S.C. 525, 531, 759 S.E.2d 434, 437 (Ct. App. 2014) (citing *State v. Kromah*, 401 S.C. 340, 353, 737 S.E.2d 490, 497 (2013)).

In *Hendricks*, the court found the appellant's hearsay objection to a recording preserved despite appellant's failure to state specific grounds, i.e., saying "hearsay," because the basis for the objection was apparent from the context. *Id.* The court based its ruling on Rule 103(a)(1), SCRE, which requires timely objection to the admission of evidence to support a claim of error and specificity in making the objection *if the ground for the objection is not apparent from the context*. *Id.* After the appellant objected, the State responded with hearsay exceptions, arguing the recording was admissible as an excited utterance or present sense impression. *Id.* This court held the issue was preserved because "the State and trial court immediately understood [the appellant's] objection was based on hearsay." *Id.*

Although the *Hendricks* court's ruling was based on Rule 103(a)(1), SCRE, our supreme court in *State v. Cain* relied, in part, on *Hendricks* when it found preserved an appellant's argument challenging the sufficiency of the State's evidence of the quantity of a drug because it was clear from the record that the State and trial court understood the basis for the appellant's argument. 419 S.C. 24, 35, 795 S.E.2d 846, 852 (2017). In *Cain*, during pre-trial motions, the appellant argued the State could not rely on "theoretical yield" to elevate a charge of manufacturing drugs to trafficking drugs under section 44-53-375 of the South Carolina Code. *Id.* at 34, 795 S.E.2d at 851. Our supreme court found this argument necessarily focused on the State's evidence of the quantity of the drug. *Id.* The court noted the State "clearly understood the argument to relate to quantity." *Id.* The trial court took the motion to dismiss under advisement, and when the appellant later moved for a directed verdict based on quantity, the trial court referred back to the previous discussion about theoretical yield to deny the motion. *Id.* at 34–35, 795 S.E.2d at 852. Because the trial court's reference to the previous discussion indicated it understood the directed verdict motion was based on "the sufficiency of the State's evidence on the element of quantity," the argument was preserved. *Id.* at 35, 795 S.E.2d at 852 (citing *Hendricks*, 408 S.C. at 531, 759 S.E.2d at 437).

Following *Cain*'s guidance, we find Appellant's argument challenging the sufficiency of the evidence of mutual combat is preserved because it is clear from the record that the circuit court and the State understood the basis for Appellant's objection. At the directed verdict stage, the circuit court was cognizant of the issue with instructing mutual combat when it is unsupported by the evidence. The court stated, "But there's one case that I read this morning, I know you all have read it too, and it's Judge Hayes' reversal for submitting a mutual combat. And that -- I need to look at that from the standpoint of everybody's protection." The court was referring to *State v. Taylor*, the case Appellant relies on in his appellate brief.

Later, after an off-the-record charge conference, the circuit court stated:

> All right. We've had a charge conference, informally, and we've gone through some certain things, and as -- first of all, as I understand, the State is requesting that I charge the mutual combat. I will include that in my charge, and I understand the Defendant objects to that inclusion. Only because I think that there is -- in view of the evidence that could suggest mutual combat construed based on the testimony. While that testimony was somewhat contradictory, it still would be evidence, if the jury believes, whatever the jury chooses to believe, would support the theory.

In other words, the trial judge decided to charge the jury on mutual combat over Appellant's objection, reasoning there was evidence to support the charge. Although the specific ground for Appellant's objection is not expressed on-the-record after the off-the-record charge conference, the record indicates that the trial judge and the State understood Appellant was objecting because he thought there was no evidence to support the charge. *See Kromah*, 401 S.C. at 353, 737 S.E.2d at 497 (holding the issue was preserved when the trial court immediately appeared to understand the objection was a renewal of a previous argument); *Hendricks*, 408 S.C. at 531, 759 S.E.2d at 437 (holding an issue was preserved because the trial court immediately understood the basis of the objection). Thus, we find that the basis of Appellant's objection is apparent from the context of the trial judge's brief synopsis of the parties' respective positions following the off-the-record charge conference. *See Hendricks*, 408 S.C. at 531, 759 S.E.2d at 437 ("We find . . . the hearsay basis for Hendricks' objection is apparent from the context . . . . Therefore, the objection preserved the issue because it is clear from the record that both the State and trial court immediately understood Hendricks' objection was based on hearsay."); *see also* Jean Hoefer Toal et al., *Appellate Practice in South Carolina* 203 (3rd ed. 2016) ("[W]here a contested issue of law has been argued during the course of the trial and ruled upon by the trial court, an objection need not be made to that portion of the charge dealing with the same issue previously ruled upon by the trial court."); *State v. Grant*, 275 S.C. 404, 407, 272 S.E.2d 169, 171 (1980) ("A review of the colloquy between the judge and counsel convinces us that the position of each was made well known prior to the commencement of the charge. We do not think that any further objection was required under these facts in order to preserve the rights of the defendant."); *Johnson*, 333 S.C. at 64 n.1, 508 S.E.2d at 30 n.1 (clarifying the long-

standing rule that "where a party requests a jury charge and, after opportunity for discussion, the trial judge declines the charge, it is unnecessary, to preserve the point on appeal, to renew the request at the conclusion of the court's instruction"). Accordingly, we find the issue is preserved and we will address the merits.

## II.     History of Mutual Combat

"The doctrine of mutual combat has existed in South Carolina since at least 1843, but has fallen out of common use in recent years." *Taylor*, 356 S.C. at 231, 589 S.E.2d at 3. "The doctrine [of mutual combat] has most often been applied in situations where the defendant and decedent bear a grudge against each other before the fight in which one of them is killed occurs." *Id*. at 232, 589 S.E.2d at 4. Mutual combat occurs when there is a mutual intent and willingness to fight. *State v. Graham*, 260 S.C. 449, 450, 196 S.E.2d 495, 495 (1973). Mutual intent is "manifested by the acts and conduct of the parties and the circumstances attending and leading up to the combat." *Id.* (citing 40 C.J.S. *Homicide* § 123). The antiquated doctrine was limited in its application by our supreme court in *State v. Taylor.* In *Taylor*, our supreme court required that the fight arise out of a pre-existing dispute and that the combatants be armed with deadly weapons. 356 S.C. at 233–34, 589 S.E.2d at 4. Additionally, each party must know the other is armed with a deadly weapon. *Id.* at 234, 589 S.E.2d at 5. Moreover, it is essential that the agreement to fight be "entered into prior to the beginning of combat," also described as an antecedent agreement to fight. 40 C.J.S. *Homicide* § 206; *accord Taylor*, 356 S.C. at 233, 589 S.E.2d at 4.

*State v. Graham* provides the quintessential example of mutual combat in South Carolina. In *Graham*, Graham and the decedent threatened each other and quarreled the day before the shooting. 260 S.C. at 451, 196 S.E.2d at 496. Graham armed himself and the two met in town the next day. *Id.* They became engaged in an altercation, which continued until Graham waived his pistol in the face of the decedent, who then left town only to return shortly thereafter with his own pistol. *Id.* The decedent parked outside of the barber shop where Graham was waiting, and the decedent stepped out of his vehicle, pistol in hand. *Id.* Graham, seeing the decedent armed, left the barber shop and walked into the street, positioning himself for an encounter. *Id.* As Graham entered the street, both parties fired, and Graham fatally wounded the decedent. *Id.*

Our supreme court determined "[t]here was ill-will between the parties" and it was "inferable that they had armed themselves to settle their differences at gun point." *Id.* at 452, 196 S.E.2d at 496. Accordingly, the question of mutual combat

was for the jury to decide. *Id.*; *see State v. Mathis*, 174 S.C. 344, 348, 177 S.E. 318, 319 (1934) (finding the law of mutual combat was appropriately instructed to the jury because "[t]here was testimony that the appellant and the [decedent] were on the lookout for each other; . . . were armed in anticipation of a combat; [and] that each drew his pistol and fired upon the other").

Similarly, other jurisdictions have found a charge on the law of mutual combat appropriate when there is evidence of an antecedent agreement to fight and when both parties are armed with dangerous weapons. *See Hughes v. State*, 274 S.W. 146, 147 (Tex. Crim. App. 1925) (emphasizing the importance of there being evidence of an antecedent agreement to fight before there can be an issue of mutual combat); *Lujan v. State*, 430 S.W.2d 513, 514 (Tex. Crim. App. 1968); *Green v. State*, 809 S.E.2d 738, 741 (Ga. 2018); *State v. Johnson*, 733 A.2d 852, 855 (Conn. App. Ct. 1999).

On the other hand, *State v. Taylor* is an example of circumstances that do not justify a jury instruction on mutual combat. In *Taylor*, the petitioner and the decedent got into a physical altercation after the petitioner attempted to stop a fight between the decedent and another person. 356 S.C. at 229, 589 S.E.2d at 2. At the suggestion of someone in the house, the petitioner and decedent moved their fight outside and, shortly thereafter, the petitioner drew a knife and stabbed the decedent fifteen times. *Id.* at 230, 589 S.E.2d at 2. Our supreme court determined there was no pre-existing ill-will between the parties and no evidence the decedent knew the petitioner was armed with a knife. *Id.* at 234, 589 S.E.2d at 5. Accordingly, there was "insufficient evidence of mutual willingness to fight to submit the issue of mutual combat to the jury." *Id.*

Although we have a limited number of cases in our jurisprudence on the law of mutual combat, that case law unequivocally indicates that it is essential there is evidence of a pre-existing ill-will between the parties and that both parties are armed with deadly weapons and have knowledge that the other is armed. *See id.* at 234, 589 S.E.2d at 4–5 (finding a charge on the law of mutual combat unwarranted when there was "no indication that [the victim] knew Petitioner was armed with a knife[] and there was no pre-existing ill-will between the parties"); *Mathis*, 174 S.C. at 348–49, 177 S.E. at 319 (finding mutual combat charge proper where appellant and deceased were on the lookout for each other and both parties were armed in anticipation of meeting the other); *Graham*, 260 S.C. at 451, 196 S.E.2d at 496 (finding mutual combat charge proper where appellant and deceased had "quarreled" prior to the killing and each knew the other was armed with a pistol).

## A. Mutual Combat Jury Instruction

In the instant case, Appellant argues the circuit court erred in charging mutual combat because there is no evidence to support the charge. We agree and find that this case is more similar to the circumstances in *Taylor* where evidence of one or more elements of mutual combat is entirely lacking. Therefore, a charge on mutual combat was improper.

First, there was no evidence of an antecedent agreement to fight or pre-existing ill-will between Appellant and Michael Morgan. *See Taylor*, 356 S.C. at 233–34, 589 S.E.2d at 4–5. No witness testified that either Appellant or Michael Morgan harbored ill-will toward the other. Moreover, no one testified to seeing Appellant argue with Michael Morgan or anyone else on the night of the shooting. *See Graham*, 260 S.C. at 451, 196 S.E.2d at 496 (finding mutual combat charge proper where, amongst other factors, appellant and deceased had quarreled prior to the killing); *Mathis*, 174 S.C. at 348–49, 177 S.E. at 319 (finding mutual combat charge proper where, amongst other factors, there was testimony that appellant and deceased were on the lookout for each other); *State v. Young*, 424 S.C. 424, 436–37, 818 S.E.2d 486, 492 (Ct. App. 2018) (finding there was sufficient evidence to charge mutual combat).

Significantly, several witnesses testified neither argument that occurred that night involved Appellant. Instead, the first argument involved Bailey and Chaplin, which was immediately defused. There was testimony that Bailey and his friends began to walk away in an effort to leave. The second unrelated argument was between Lucas and Irvin—individuals who were not associated with Appellant and his friends. Additionally, there was testimony that Appellant was pulling Bailey towards Humphries' vehicle so that they could leave. Furthermore, Humphries testified that Appellant was inside of Humphries' vehicle when the shooting began. *See Graham*, 260 S.C. at 450, 196 S.E.2d at 495 ("[Mutual] intent may be manifested by the acts and conduct of the parties and the circumstances attending and leading up to combat." (citing 40 C.J.S. *Homicide* § 124)); *see also Green*, 809 S.E.2d at 741 (holding a jury instruction on mutual combat was not warranted where there was no evidence that victim had an intention to fight Green and, instead, the evidence showed victim was feuding with Green's friend).

Notably, during oral argument, the State maintained that the flashing of guns between Bailey and Chaplin was "the assent for mutual combat" as it related to Appellant. However, we disagree, and as our supreme court stated in *Taylor*, "[I]t is only logical that the evidence of agreement to fight be plain . . . ." 356 S.C. at

234, 589 S.E.2d at 4. To maintain that an argument that did not involve Appellant manifested his assent to engage in mutual combat with Michael Morgan is illogical. *See id.* at 235, 589 S.E.2d at 5 ("The mutual combat doctrine is triggered when both parties contribute to the resulting fight."); *see also Green*, 809 S.E.2d at 741 (holding charge on mutual combat was not warranted when there was no evidence that the victim had an intention to fight the defendant). Thus, there is no evidence that Appellant and Michael Morgan had an antecedent agreement to fight. *See Taylor*, 356 S.C. at 234, 589 S.E.2d at 5 (finding the circuit court erred in charging the law on mutual combat when there was no evidence of pre-existing ill-will or a dispute between victim and petitioner); *see also Lujan*, 430 S.W.2d at 514 (holding charge on mutual combat was unwarranted when there was no evidence of an antecedent agreement); *Hughes*, 274 S.W. at 147 (finding insufficient evidence of antecedent agreement to fight); *id.* ("In our opinion[,] the evidence in this case did not raise the issue of mutual combat. The evidence is utterly lacking in anything indicating any prearrangement between the appellant and the deceased to engage in combat. There is nothing to suggest any ill feeling between [the defendant and victim] until the very moment they began to fight.").

Finally, there was no evidence that Michael Morgan had reason to believe Appellant was armed with a deadly weapon before the shooting started. *See Taylor*, 356 S.C. at 234, 589 S.E.2d at 5. Witnesses testified that they did not see Appellant with a gun prior to the shooting. No one testified to seeing Appellant flash a gun. In fact, the basis for the State's theory of mutual combat was that Appellant picked up Bailey's gun after Bailey was shot. Smalls testified that after Bailey was fatally wounded, he saw Appellant trying to help put Bailey inside of Humphries' car. Smalls indicated that was when he saw Appellant holding Bailey's gun and he did not see Appellant trying to shoot anyone with Bailey's gun. Smalls further stated that he did not see Appellant with a gun prior to the shooting. Additionally, there was no conclusive evidence of gun shot residue found on Appellant.[5] Moreover, Appellant's recorded statement, "I ain't killed the boy, I only shot the boy," is insufficient to support a theory of mutual combat when evidence for one or more elements of the doctrine is lacking. Therefore, we find there is "insufficient evidence of a mutual willingness to fight" with deadly weapons and the issue of mutual combat should not have been submitted to the jury. *See id.* at 234, 589 S.E.2d at 5 (holding there was insufficient evidence of mutual willingness to fight to submit the issue of mutual combat to the jury); *id.* (noting that prior South Carolina cases

---

[5] The evidence presented indicated that there were lead particles found on Appellant; however, the other two main components of gunshot residue, barium and antimony, were not found.

"emphasize[d] that each party knew the other was armed"); *see also Stewart v. State*, 356 S.E.2d 515, 517 (Ga. 1987) (holding there was insufficient evidence to warrant a charge on mutual combat where "there was no evidence that the victim was armed with a deadly weapon at the time of the fight, nor [] was there any evidence that [defendant] and the victim mutually agreed to fight with deadly weapons"); *Hughes*, 274 S.W. at 147 ("[T]he issue of mutual combat . . . does not arise alone from the fact that the parties to the affray are mutually engaged in it, but that the issue arises out of an antecedent agreement to fight . . . [and] before there can be the issue of mutual combat, the testimony must show that the agreement exists.").

## B. Prejudice

However, our inquiry does not end because the erroneous charge must also be prejudicial to be reversible. *Taylor*, 356 S.C. at 231, 598 S.E.2d at 3. We find the erroneous charge on mutual combat was prejudicial because the charge effectively negated Appellant's self-defense plea.

The commingling of mutual combat and self-defense jury instructions is problematic. *See id.* at 233, 589 S.E.2d at 4 (noting that, in Georgia, commingling charges on mutual combat and self-defense is per se harmful because it places a heavier burden on the defendant than is required for self-defense (citing *Grant v. State*, 170 S.E.2d 55, 56 (Ga. Ct. App. 1969))). Essentially, the no-fault element of self-defense requires that the defendant is "without fault in bringing on the difficulty," and the State has the burden of disproving self-defense beyond a reasonable doubt. *State v. Davis*, 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984). Yet mutual combat negates the no-fault element of self-defense because mutual combat requires an intent and willingness to fight. *Taylor*, 356 S.C. at 232, 589 S.E.2d at 3; *see id.* at 234, 589 S.E.2d at 4 ("[M]utual combat acts as a bar to self-defense because it requires mutual agreement to fight on equal terms for purposes other than protection."). Stated differently, if a person has an intent and willingness to fight, manifested by conduct, that person cannot be without fault in bringing on the difficulty, and, as a matter of law, the plea of self-defense is unavailable. *See State v. Porter*, 269 S.C. 618, 622, 239 S.E.2d 641, 643 (1977) ("As a general rule, the plea of self-defense is not available to one who kills another while engaged in mutual combat.").

To complicate matters further, a defendant may still claim self-defense after having engaged in mutual combat if, before the killing, the defendant withdraws and "endeavors in good faith to decline further conflict, and[,] either by word or act, makes that fact known to his [or her] adversary." *Taylor*, 356 S.C. at 232 n.2, 589

S.E.2d at 3 n.2 (quoting *Graham*, 260 S.C. at 451, 196 S.E.2d at 496).  This heightened standard directly conflicts with the no-fault element of self-defense and, when there is no evidence of mutual combat, has the effect of placing the burden on the defendant to prove self-defense.  This is true even when self-defense is properly charged, i.e., the jury is instructed that the State must disprove self-defense beyond a reasonable doubt.  *Id.* at 235, 589 S.E.2d at 5 (noting the trial court charged self-defense properly but "that charge was negated by the court's unwarranted charge on mutual combat," which limited the petitioner's "ability to claim self-defense" and prejudiced the petitioner by requiring him to prove self-defense).

Here, the court instructed the jury on mutual combat and self-defense as follows:

> Now, I want to discuss with you a part of the theory that you'll have to consider, and it's known as mutual combat. And this law provides that if a [d]efendant voluntarily participated in mutual combat for the purpose other than protection, the killing of a victim would not be self-defense.  This is true even if during the combat[,] the Defendant feared death or serious bodily injury.
>
> However, if before the killing is committed the [d]efendant withdraws and tried in good faith to avoid further conflict, and either by word or act makes that fact known to the victim, he would be without fault in bringing on the difficulty.
>
> For mutual combat there must be a mutual intent and a willingness to fight.  This intent may be shown by the acts and conduct of the parties and circumstances surrounding the combat.  In addition, it must . . . be shown that both parties were armed with a deadly weapon.
>
> The Defendant has raised the defense of self-defense.  And self-defense would be a complete defense if it is established, and you must find the Defendant not guilty.  The State has the burden of disproving self-defense by -- beyond a reasonable doubt.  If you have a reasonable doubt of the Defendant's guilt after considering all the

evidence, including the evidence of self-defense, then you
must find the Defendant not guilty.

The jury was then instructed on the four elements of self-defense. Additionally, the jury was instructed on the interplay between mutual combat and self-defense: "[A]s you know the mutual combat says if he's mutually engaged, then self-defense goes out the window, so to speak. It's not available. But if [the State] failed to prove that then you would consider the self-defense aspect, or again, the State had to prove or disprove that self-defense."

Although the court instructed self-defense properly, we find the self-defense instruction was negated by the court's unwarranted instruction on mutual combat, which effectively relieved the State of its burden to disprove self-defense and imposed on Appellant the burden to prove self-defense. *See Taylor*, 356 S.C. at 235, 589 S.E.2d at 5 (noting the trial court charged self-defense properly but "that charge was negated by the court's unwarranted charge on mutual combat," which limited the petitioner's "ability to claim self-defense" and prejudiced the petitioner by requiring him to prove self-defense). Therefore, we find that Appellant was prejudiced by having to prove self-defense, contradicting our state's well-established jurisprudence that the State has the burden of disproving self-defense.

Accordingly, we reverse Appellant's convictions and remand for a new trial.[6] Because we reverse based on the unwarranted mutual combat jury instruction, we need not address Appellant's related argument that the circuit court erred by instructing the jury on voluntary manslaughter. *Edwards v. State*, 372 S.C. 493, 496–97, 642 S.E.2d 738, 740 (2007) (holding the appellate court need not address remaining issues when resolution of a prior issue is dispositive).

**REVERSED AND REMANDED.**

**LOCKEMY, C.J., and THOMAS, J., concur.**

---

[6] At oral argument, both counsel for the State and Appellant maintained that all of Appellant's charges were intertwined and a reversal would apply to all of Appellant's convictions. We agree—especially, under these circumstances, where Appellant's self-defense plea was negated by the unwarranted jury instruction. *See State v. Blurton*, 352 S.C. 203, 208, 573 S.E.2d 802, 804 (2002) ("If a jury instruction is provided to the jury that does not fit the facts of the case, it may confuse the jury.").